1  BRYAN A. MERRYMAN (SBN 134357)
   J. JONATHAN HAWK (SBN 254350)
2  WHITE & CASE LLP
   633 W. Fifth Street, Suite 1900
3  Los Angeles, CA  90071-2007
   Telephone: (213) 620-7700
4  Facsimile:  (213) 452-2329
   Email:  bmerryman@whitecase.com
5  Email:  jhawk@whitecase.com

6  BIJAL V. VAKIL (SBN 192878)
   JEREMY OSTRANDER (SBN 233489)
7  WHITE & CASE LLP
   5 Palo Alto Square, 9th Floor
8  3000 El Camino Real
   Palo Alto, CA  94306
9  Telephone: (650) 213-0300
   Facsimile:  (650) 213-8158
10 Email:  bvakil@whitecase.com
   Email:  jostrander@whitecase.com
11
   Attorneys for Defendant
12 GROUPME, INC.

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                   OAKLAND DIVISION

16 BRIAN GLAUSER, individually and on behalf     CASE NO. 4:11-cv-02584-PJH
   of a class of similarly situated individuals,
17
                              Plaintiffs,          **DEFENDANT GROUPME, INC.'S**
18                                                 **MEMORANDUM OF POINTS AND**
              v.                                   **AUTHORITIES IN SUPPORT OF**
19                                                 **MOTION TO DISMISS THE AMENDED**
   TWILIO, INC., a Delaware corporation; and       **COMPLAINT, TO STAY THE ACTION**
20 GROUPME, INC., a Delaware corporation,          **OR TRANSFER VENUE**

21                                                 **[Filed Concurrently With Notice of**
                              Defendants.          **Motion and Motion; Declarations of Steve**
22                                                 **Martocci and J. Jonathan Hawk; Request**
                                                   **for Judicial Notice; and Proposed Order]**
23

24                                                 Complaint Filed: May 27, 2011
                                                   Date:          January 25, 2012
25                                                 Time:          9:00 a.m.
                                                   Courtroom:     3
26                                                 Judge:         Hon. Phyllis J. Hamilton

27

28

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ..................................................................................................... 1

II.     STATEMENT OF ISSUES ...................................................................................... 2

III.    BACKGROUND ...................................................................................................... 3

    A.      GroupMe ....................................................................................................... 3

    B.      Procedural History and Plaintiff's Claim ..................................................... 6

    C.      The TCPA ...................................................................................................... 8

IV.    ARGUMENT ........................................................................................................... 9

    A.      The Amended Complaint Is Insufficiently Pleaded and Must Be Dismissed ........ 9

    B.      The Court Should Dismiss or Stay this Action Under the Doctrine of Primary Jurisdiction ................................................................................................... 11

        1.      Primary Jurisdiction Is Appropriate If a Case Implicates the FCC's Regulatory Authority Over a Particular Statute ..................................... 12

        2.      Congress Has Entrusted the FCC With Comprehensive Regulatory Authority Over the TCPA ..................................................................... 13

            a.      The FCC's Current, Parallel TCPA Proceeding Will Address the Statute's Consent Requirement ............................... 15

            b.      The FCC's Current, Parallel TCPA Proceeding Will Likely Address What Constitutes An Auto-Dialer .................................. 17

        3.      Uniform Administration of the TCPA Requires Dismissal or A Stay of This Action Pending Resolution of the Parallel FCC Proceeding ........... 18

    C.      In the Alternative, This Action Should be Transferred to the Eastern District of Virginia Pursuant to 28 U.S.C. Section 1404(a) ............................................... 21

        1.      Factors To Consider .............................................................................. 22

        2.      Plaintiff Has No Significant, Relevant Contacts With This District And The Court Should Disregard His Choice of Forum ................................. 22

        3.      The Locations of Key Witnesses and Evidence Favor Transfer ............... 23

        4.      The Remaining Factors Favor Transfer ................................................. 24

V.     CONCLUSION ...................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**<u>Page(s)</u>**

4

### **FEDERAL CASES**

5

6
*Alexander v. Franklin Res., Inc.*,
   2007 WL 518859 (N.D. Cal. Feb. 14, 2007) ........................................................................ 22

7
*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) .................................................................................................. 9-11

8

9
*Auer v. Robbins*,
   519 U.S. 452 (1997) ............................................................................................................ 14

10
*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
   2006 WL 4568798 (C.D. Cal. Nov. 30, 2006) .................................................................... 25

11

12
*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................... 9-11

13
*Brown v. MCI WorldCom Network Servs., Inc.*,
   277 F.3d 1166 (9th Cir. 2002) ............................................................................................ 21

14

15
*Charvat v. EchoStar Satellite, LLC*,
   630 F.3d 459 (6th Cir. 2010) ................................................................................... 12, 14, 21

16
*Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................................................ 14

17

18
*Clark v. Time Warner Cable*,
   523 F.3d 1110 (9th Cir. 2008) ................................................................................12-13, 19-21

19
*Gerin v. Aegon USA, Inc.*,
   2007 WL 1033472 (N.D. Cal. Apr. 4, 2007) ...................................................................... 22

20

21
*Greene v. DirecTV*,
   2010 U.S. Dist. LEXIS 118270 (N.D. Ill. Nov. 8, 2010) .................................................... 15

22
*Jones v. GNC Franchising, Inc.*,
   211 F.3d 495 (9th Cir. 2000) .............................................................................................. 22

23

24
*Kemp v. Int'l Business Machines Corp.*,
   2010 WL 4698490 (N.D. Cal. Nov. 8, 2010) ...................................................................... 10

25
*Knutson v. Reply!, Inc.*,
   2011 WL 291076 (S.D. Cal. Jan. 27, 2011) .............................................................. 9, 10, 11

26

27
*Lacey v. Maricopa County*,
   649 F.3d 1118, 2011 WL 2276198 (9th Cir. June 9, 2011) ................................................ 11

28

*Leckler v. Cashcall, Inc.*,
    2008 U.S. Dist. LEXIS 97439 (N.D. Cal. Nov. 21, 2008)..................................................... 15

*Lou v. Belzberg*,
    834 F.2d 730 (9th Cir. 1987)........................................................................................ 22

*Lyon v. Gila River Indian Community*,
    626 F.3d 1059 (9th Cir. 2010), *petition for cert. filed*, 80 U.S.L.W. 3058 (U.S. Jul. 15,
    2011) .......................................................................................................................... 19

*Pac-West Telecomm., Inc. v. MCI Communications Servs., Inc.*,
    2011 WL 1087195 (E.D. Cal. Mar. 23, 2011) ........................................................ 12

*PRG–Schultz USA Inc., v. Gottschalks, Inc.*,
    2005 WL 2649206 (N.D. Cal Oct. 17, 2005)................................................... 22, 23

*Saleh v. Titan Corp.*,
    361 F. Supp. 2d 1152 (S.D. Cal. 2005) .............................................................22-25

*Starkey v. Firstsource Advantage, LLC*
    2010 U.S. Dist. LEXIS 60955 (W.D.N.Y. Mar. 11, 2010)..................................... 15

*Syntek v. Semiconductor Co., Ltd. v. Microchip Tech. Inc.*,
    307 F.3d 775 (9th Cir. 2002)............................................................................. 12, 21

*Unimat, Inc. v. MCI Telecomms. Corp.*,
    1992 WL 391421 (E.D. Pa. Dec. 16, 1992) ........................................................... 12

## FEDERAL STATUTES

28 U.S.C. § 1391(b)(2)................................................................................................. 23

28 U.S.C. § 1404(a) ............................................................................................ 2, 3, 22

47 U.S.C. §§ 227, *et seq.* .................................................................................. 1, 8, 9, 14,

## FEDERAL RULES

Fed. R. Civ. P. 8 .......................................................................................................... 9

Fed. R. Civ. P. 12 ................................................................................................. 3, 9, 11

Fed. R. Civ. P. 45 ...................................................................................................... 24

## LEGISLATIVE MATERIALS

H.R. Rep. No. 102-317 (1991)...................................................................................... 8

H.R. Rep. No. 101-633 (1990)...................................................................................... 8

S. Rep. No. 102-178 (1991) ......................................................................................... 8

-iii-

137 Cong. Rec. S18317-01 (1991) ............................................................................. 8

137 Cong. Rec. S18781 (1991) ................................................................................. 14

## FEDERAL REGULATIONS

47 C.F.R. § 64.1200 ................................................................................................ 15

## ADMINISTRATIVE AGENCY MATERIALS

*In re Matter of Rules and Regulations Implementing the Telephone Consumer Proteciton Act of 1991*, Report and Order, CG Docket No. 02-278, 7 FCC Rcd 8752 (September 17, 1992) ............................................................................................................. 14

*In re Matter of Rules and Regulations Implementing the Telephone Consumer Proteciton Act of 1991*, Report and Order, CG Docket No. 02-278, 18 FCC Rcd 14014 (June 26, 2003) ................................................................................................................ 13, 15

*In re Matter of Rules and Regulations Implementing the Telephone Consumer Proteciton Act of 1991*, Declaratory Ruling, CG Docket No. 02-278 (December 28, 2007) .................. 14

*Public Notice, Consumer & Governmental Affairs Bureau Seeks Comment on Club Texting's Petition for Declaratory Relief htat Text Broadcasters are Not "Senders" of Text Messages Under § 227(b)(1) of the Telephone Consumer Protection Act*, CG Docket No. 02-278 (August 25, 2009) ................................................................... 16

*In re Matter of Rules and Regulations Implementing the Telephone Consumer Proteciton Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, 25 FCC Rcd 1501 (January 20, 2010) ............................................................................... 15-16

Comments of Sprint Nextel, LLC, CG Docket No. 02-278 (May 21, 2010) .............................. 18

Comments of Cargo Airline Association, CG Docket No. 02-278 (June 21, 2010) .................... 18

Comments of Wells Fargo &  Co., CG Docket No. 02-278 (June 21, 2010) ......................... 16-17

Comments of the Mobile Marketing Association, CG Docket No. 02-278 (May 21, 2010) ....... 18

Notice of *Ex Parte* Presentation to Marlene Dorch, FCC, from Michele Farquhar, Counsel to Encore Capital Group, Inc., CG Docket No. 02-278 (May 5, 2011) .............. 16, 18

Reply Comments of CTIA – The Wireless Association, CG Docket No. 02-278 (June 21, 2010) ......................................................................................................... 18

Reply Comments of JPMorgan Chase & Co., CG Docket No. 02-278 (June 21, 2010) ......... 17-18

Reply Comments of Portfolio Recovery Associates, LLC, CG Docket No. 02-278 (June 21, 2010) ............................................................................................................ 16

Reply Comments of the United Parcel Service In Response to Global Tel*Link Corporation's Petition for Declaratory Ruling, CG Docket No. 02-278 (July 15, 2010) ....... 18

-iv-

1

# MISCELLANEOUS

2    15 Charles Allan Wright, et al., Federal Practice and Procedure, Jurisdiction 3d § 3851
3        (3d ed. 2006) ...................................................................................................................... 24

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LOSANGELES 928871 (2K)

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.**   <u>**INTRODUCTION**</u>

3   On April 23, 2011, Plaintiff and ten other people received a text message from their

4   friend, inviting them to play poker.  Plaintiff, within two hours of receiving that text message,

5   responded to the entire "Poker" group with his own social text message, and a group text message

6   conversation ensued about social matters.  Plaintiff thereafter registered with GroupMe to create

7   and send his own group text messages using its service.

8   Approximately one month after participating in the "Poker" group text messaging

9   conversation, Plaintiff filed this putative class action against GroupMe and defendant Twilio, Inc.

10   ("Twilio"), alleging violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. §

11   227, *et seq.* (the "TCPA").  Plaintiff alleges that GroupMe, without his consent, "spammed" him

12   on April 23 with text messages – the same text messages he received as part of his "Poker" group.

13   Plaintiff alleges that, to send such "wireless spam" "*en masse*,"[1] GroupMe used an "automatic

14   telephone dialing system" (also an "auto-dialer") as the TCPA defines that term.  Plaintiff's claim

15   is not only without merit but, important here, insufficiently pleads GroupMe's purported use of an

16   auto-dialer, which is an element of any TCPA violation.

17   The only allegation in the Amended Complaint even suggesting GroupMe's technology,

18   through which Plaintiff and the other "Poker" group participants exchanged their group text

19   messages, constitutes an auto-dialer is that it "upon information and belief, had the capacity to

20   store or produce telephone numbers to be called, using a random or sequential number generator."

21   That allegation, in addition to being made upon information and belief, is a mere recitation of the

22   TCPA's definition of auto-dialer and does not make it plausible, *i.e.* more likely than not,

23   GroupMe violated the TCPA.  Moreover, it is contradicted by well-pleaded factual allegations in

24   the Amended Complaint that GroupMe, in fact, did **not** use auto-dialer capabilities when

25   "sending" Plaintiff his "Poker" group text messages.

26   Further, two issues raised by Plaintiff's claim are matters of first impression that the Court

---

[1] Notably, the Amended Complaint also truthfully alleges that GroupMe group sizes are limited to twenty-five people.  As a result, no one text message can be delivered to a greater number of people.

1

1   should refer to the Federal Communications Commission ("FCC") under the doctrine of primary

2   jurisdiction. The FCC, as the administrative agency that is Congressionally-charged with

3   adopting regulations to implement the TCPA's requirements, has created a complex regulatory

4   scheme to ensure uniform enforcement and application of the statute. Most recently, the FCC

5   issued a 2010 Notice of Proposed Rulemaking on the TCPA and is currently holding a related

6   parallel proceeding to resolve the form and content of "consent" a caller must obtain from a

7   called-party in order to avoid violating the TCPA. That FCC proceeding is also likely to address,

8   as urged by many commentators, how to adapt the definition of "auto-dialer" to apply to modern

9   technology that was not anticipated twenty years ago when the statute was enacted. Both of these

10  issues – the "consent" defense and the definition of "auto-dialer" – are central to this case.

11         The Court should not, in the midst of an FCC proceeding on the issue, attempt to decide

12  whether GroupMe, as it will claim pursuant to a 1992 FCC regulation on the TCPA, obtained the

13  appropriate consent from Plaintiff and the other members of the putative class to participate in

14  group texting because those individuals released their cellular telephone numbers. Likewise, the

15  Court should not attempt to apply a twenty-year old definition of "auto-dialer to GroupMe's

16  "emerging" and "alternative" technology that employs virtual, voice over Internet-Protocol

17  ("VoIP") "long code" telephone numbers, enabled to carry voice and text messages over the

18  Internet. The FCC is the administrative agency charged with addressing such issues and is in the

19  process of doing so.

20         Lastly, if the Court finds the Amended Complaint is sufficiently pleaded (which it is not)

21  or referral to the FCC is not appropriate (which it is), this case should be transferred under 28

22  U.S.C. § 1404(a) to the Eastern District of Virginia, Richmond Division. Plaintiff, a Virginia

23  domiciliary, has not pleaded any significant contacts with this District and the bulk of the

24  evidence, including key witnesses, are located on the east coast.

25  **II.       STATEMENT OF ISSUES**

26         1.       Does the Amended Complaint state a claim, based on factual allegations, from

27  which it is plausible, *i.e.*, not merely possible, that GroupMe sent text messages to Plaintiff

28  using an "automatic telephone dialing system" as the TCPA defines that term?

2

2.      Should this case be dismissed or stayed pursuant to the doctrine of primary jurisdiction pending the FCC's determination of one or both of the following issues presented in this case:

>   (a) what is the precise form (*i.e.*, oral or written) and content of the "prior express consent" a party sending a text message to a cellular telephone is required to obtain from the called-party before sending the text message so as not to violate the TCPA; and

>   (b) how will the definition of "auto-dialer," currently based on functionalities that were rare in 1991, be revised so that it can be applied to new and emerging technologies without encompassing the most common of everyday devices, such as smartphones?

3.      Should this case be transferred, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Eastern District of Virginia, Richmond Division, where Plaintiff and third-party witnesses reside and many of the computer servers implicated in the Amended Complaint are located?

## III.   BACKGROUND

### A.   GroupMe[2]

Stemming from their desire to create a group messaging system that would allow them to better communicate with each other and friends at music festivals, Jared Hecht and Steve Martocci founded GroupMe in New York City in June 2010. Martocci Decl., ¶ 4. GroupMe, for which Martocci built the initial prototype of the service, is based on a simple idea: create the easiest way for people to start conversations and keep in touch with their families, friends and real life networks using private Short Message Service ("SMS") groups. Martocci Decl., ¶¶ 1, 4, 5. Indeed, since its inception in mid-2010, GroupMe has been used by a wide range of real life networks to communicate, including by cancer support groups and student organizations, and the most common group names currently on the service are "Mom" and "Dad." Martocci Decl., ¶ 5.

---

[2] The background in this section is provided only for GroupMe's primary jurisdiction and transfer arguments. GroupMe's Rule 12(b)(6) argument does not rely on or reference this section and is strictly limited to the allegations of the Amended Complaint and judicially noticed materials.

3

1       GroupMe's potential uses, however, reach far beyond messaging for purely friendly,

2  social purposes.  When an outbreak of tornadoes devastated towns in the southern United States

3  in April 2011, shutting down power and landlines and congesting data networks, people used

4  GroupMe to check on family and friends.  Martocci Decl., ¶ 20.  Similarly, neighborhood watch

5  groups have utilized GroupMe to communicate real-time emergencies, such as home invasions

6  and car thefts.  As GroupMe grows, it adds new features to change the way that individuals

7  communicate with their surrounding communities.  *Id.*

8       GroupMe works as follows:  a user must register for GroupMe by visiting its website at

9  www.groupme.com, where he types in his name, wireless phone number and email address.

10  Martocci Decl., ¶ 7.  The new user, in turn, receives a confirmation code and a welcome text

11  message on his cellular telephone stating, approximately:  "Welcome to GroupMe!  Group

12  texting, calling & more.  Your confirmation code is MQZTP.  Msg. & data rates may apply."

13  Martocci Decl., ¶ 8.  The new user completes his registration by typing that confirmation code

14  into the GroupMe website, which verifies he owns the telephone number he initially entered

15  during the registration process.  *Id.*  The registered user can then create texting groups of up to

16  twenty-four individuals by entering the individuals' names and cellular telephone numbers.

17  Martocci Decl., ¶¶ 8-9; Am. Compl., ¶ 12.  Importantly, during the registration process, group

18  creators must represent to GroupMe that they have obtained the consent of the individuals they

19  add to groups.  Am. Compl., ¶ 13.

20       Twilio's service works in conjunction with GroupMe's, providing connectivity to

21  traditional telephone networks and to the Internet through application programming interfaces.

22  Am. Compl., ¶ 18; Martocci Decl., ¶ 17.  Twilio provides GroupMe with group phone numbers

23  which GroupMe, in turn, assigns to text messaging groups organized through its service.  Once

24  a group is organized, each text message sent by a group member is sent to Twilio's systems and

25  the unique number assigned to that group via the Internet.  The text message is then routed by

26  GroupMe over Twilio's systems for simultaneous delivery to the other group members.  Am.

27  Compl., ¶ 11; Martocci Decl., ¶ 17.

28       The text messages are delivered using the SMS protocol, limited to 160 characters per

4

message.  Martocci Decl., ¶ 10.  As a result, individual communications seeking to exceed 160 characters may be split into more than one text message for delivery.  *Id*.  The text messages are also delivered using "long code," as opposed to "short code."  Am. Compl., ¶ 32; Martocci Decl., ¶ 11.  A short code is a five or six-digit telephone number that can only deliver text messages in the United States to a mobile device and, to function, must be rented from and registered with the Common Short Code Administration ("CSCA") and connected to a mobile carrier.  Martocci Decl., ¶¶ 12-13.  The use of short code in mobile marketing is further regulated by two leading nonprofit industry trade groups that publish "Best Practices" on the subject, which are enforced by wireless carriers: the CTIA – The Wireless Association ("CTIA"), representing the wireless communications industry, and the Mobile Marketing Association ("MMA"), representing both wireless operators and marketers.  *Id*.

Long code, by contrast, is a virtual, VoIP ten-digit telephone number enabled to carry both voice and text message traffic and can be deployed both domestically and internationally from a mobile device, landline, email or web-based application.  Martocci Decl., ¶ 11.  Long code essentially connects the wired and wireless systems; for example, a text message can be delivered via long code, and the recipient of that text message can then place a voice call to the sender via the same long code number.  *Id*.  The CTIA and MMA have not issued any mobile marketing "Best Practices" applicable to long code.  Martocci Decl., ¶ 13.

When using GroupMe's service, its users have the option of either receiving notifications via text message or downloading the GroupMe Internet application and receiving push notifications on their smartphones via the Internet.  Martocci Decl., ¶ 15.  The GroupMe application specifically helps those users, who prefer not to receive text messages, participate in groups without being hindered by service limitations associated with their carriers' particular SMS plans (*e.g.*, geographic limitations and additional costs).  *Id*.  Approximately 40% of GroupMe messages are delivered by the application rather than via text message.  *Id*.

Importantly, GroupMe is not a marketing service or tool.  In fact, GroupMe has implemented numerous policies and procedures intended to prevent individuals from using the service for such purposes.  For example, GroupMe has rules prohibiting spamming, and it limits

5

GROUPME'S MOTION TO DISMISS, STAY, OR TRANSFER; 4:11-CV-02584-PJH

1   the size of each group and the number of groups that may be created from the same IP address

2   to enforce that prohibition.  Am. Compl., ¶ 12; Martocci Decl., ¶¶ 14, 21.  Further, GroupMe

3   limits the content it provides to users to informational messages that will be helpful, such as

4   advising each group member that he has been added to a group, how to be removed from the

5   group, and if the user does not participate in a group he will be removed from it by the service.

6   Martocci Decl., ¶ 14; Am. Compl., ¶¶ 33, 35, 38.

7          GroupMe has never sent any "blast" SMS text messages to all GroupMe users and is

8   technologically incapable of doing.  Martocci Decl., ¶ 16.  All messages, delivered to no more

9   than twenty-five people at a time (the maximum group size), are triggered solely in response to

10  the behavior of group creators and users.  Am. Compl., ¶ 12; Martocci Decl., ¶¶ 8-9, 14-16.

11          **B.        Procedural History and Plaintiff's Claim**

12         On May 27, 2011, Plaintiff filed a putative class action complaint against Twilio and

13  GroupMe, alleging a single claim for sending text messages to cellular telephones in violation of

14  the TCPA.  Complaint, Dkt. No. 1.  Twilio and GroupMe filed separate motions to dismiss the

15  Complaint on August 25 and 28, 2011, respectively.  Motions to Dismiss, Dkt. Nos. 21 and 23.

16  Plaintiff did not oppose either motion and, instead, filed an Amended Complaint on September

17  15, 2011.  Response to Motions and Amended Complaint, Dkt. Nos. 30 and 34, respectively.

18         The Amended Complaint, which Plaintiff filed as a putative class action, restates many of

19  the original Complaint's factual allegations.  The Amended Complaint alleges, in relevant part,

20  that "[b]ulk text message, or SMS marketing, has emerged as a new and direct method of

21  communicating and soliciting consumer business."  Am. Compl., ¶ 8, Dkt. No. 34.  It alleges that

22  "[t]he newest evolution of text message marketing has taken the form of 'group messaging'

23  applications, such as defendant GroupMe's service," which was "released" in approximately

24  August 2010.  Am. Compl., ¶¶ 10-12.  It alleges that GroupMe's "group texting tool" allows

25  people to "request that GroupMe simultaneously transmit SMS text messages to large groups of

26  people *en masse*, using one common cellular telephone number provided by Defendant Twilio."

27  *Id.*, ¶ 11 (emphasis in original).

28         The Amended Complaint alleges that, to use GroupMe's "service, a customer signs up by

6

GROUPME'S MOTION TO DISMISS, STAY, OR
TRANSFER; 4:11-CV-02584-PJH

1   providing basic information through the GroupMe website or mobile application, creates a

2   'group' of up to twenty-four individuals, and provides the full names and cellular telephone

3   numbers of each group member to Defendant GroupMe."  Am. Compl., ¶ 12.  It alleges that,

4   when a user signs up for its service, GroupMe "requires the group creator to represent that they

5   have the consent of the individuals they intend to add to a group, which almost never happens."

6   *Id.*, ¶ 13.  It alleges that, thereafter, GroupMe, with Twilio, "harvest[s] all phone numbers added

7   by group creators in order to independently send its own text message advertisements promoting

8   its service and mobile applications."  *Id.*, ¶ 27.

9         The Amended Complaint alleges that, on April 23, 2011, Plaintiff received a text message,

10   containing "advertisements of GroupMe's service and mobile application," from a "phone

11   number . . . owned and/or operated by Defendant Twilio, and provided by Twilio to Defendant

12   GroupMe."  Am. Compl., ¶¶ 31-32.  It alleges that the initial text message to Plaintiff, notifying

13   him he was added to the "Poker" texting group, "was made directly by Defendants and not

14   initiated or consented to by Plaintiff or the group creator."  *Id.*, ¶ 34.  It alleges that Plaintiff never

15   participated in the "Poker" texting group, yet received a total of fifteen text messages from that

16   group and from GroupMe; the four text messages Plaintiff alleges he received from GroupMe,

17   including the initial message, explained how to avoid text messaging charges, exit the group,

18   notified Plaintiff his non-participation in the group would result in removal from the group, and

19   eventually notified Plaintiff he had, in fact, been removed due to non-participation.  *Id.*, ¶¶ 32-41.

20         The Amended Complaint alleges that, "[a]s a result of Defendants' software and

21   application design, thousands of consumers receive text message calls from and through

22   Defendant GroupMe's service that they never consented to nor wanted."  Am. Compl., ¶ 25.  It

23   alleges that the text messages received by Plaintiff and others in the proposed class "were made

24   *en masse* and without the prior express consent of the Plaintiff and the other members of the

25   Classes to receive such wireless span."  *Id.*, ¶¶ 55-56.  It alleges that the text messages Plaintiff

26   received from GroupMe "included advertisements about [its] service and mobile application that

27   were written in an impersonal and generic manner and came from a phone number assigned

28   solely to transmit such text message calls."  *Id.*, ¶ 56.  It alleges that Twilio and GroupMe sent the

7

1     text messages received by Plaintiff and others using "equipment and software . . . that, upon

2     information and belief, had the capacity to store or produce telephone numbers to be called, using

3     a random or sequential number generator."  *Id.*, ¶ 55.

4         Based on the foregoing, the Amended  Complaint alleges one claim against Twilio and

5     GroupMe for violations of Section 227(b)(1)(A)(iii) of the TCPA, and seeks to certify two classes

6     of plaintiffs; it prays for statutory damages of $500 per text message sent, trebled to $1,500 per

7     text message in the Court's discretion.  Am. Compl., ¶¶ 43, 54-60.

8         Notably, Plaintiff did participate in the "Poker" group despite contrary allegations in the

9     Amended Complaint.  On April 23, 2011, he responded to the entire "Poker" group text with his

10    own social text message.  Martocci Decl., ¶ 28; Request for Judicial Notice ("RJN") at 4-5.

11    Plaintiff also later registered for a GroupMe account, accepting its terms and conditions of

12    service.  Martocci Decl., ¶ 29.

13       **C.**      **The TCPA**

14         In enacting the TCPA in 1991, Congress sought to prohibit telemarketing practices it

15    considered to be an invasion of consumer privacy and a threat to public safety.  *See Telephone*

16    *Consumer Protection Act of 1991*, Pub. L. No. 102-243, 105 Stat. 2394 § 2(5) (1991) (codified

17    at 47 U.S.C. § 227, *et seq.*).  Such telemarketing practices included calls made using randomly

18    or sequentially generated telephone numbers that could reach unlisted numbers, hospitals, or

19    other emergency service providers.  *See* RJN, Ex. B (137 Cong. Rec. S18317-01 at 2 (1991));

20    RJN, Ex. C (H.R. Rep. No. 101-633 (1990)); RJN, Ex. D (S. Rep. No. 102-178 at 2 (1991)); and

21    RJN, Ex. E (H.R. Rep. No. 102-317 at 10 (1991)).  Accordingly, Congress focused the TCPA's

22    regulations on prohibiting the use of equipment that would enable such intrusive calls.

23         With regard to calls to cellular telephones, the TCPA provides that: "[i]t shall be

24    unlawful for persons within the United States –

25         (A) to make any call (other than a call for emergency purposes or made with the prior
         express consent of the called party) using any automatic telephone dialing system or
26         artificial or prerecorded voice –

27         * * *

28         (iii) to any telephone number assigned to a paging service, cellular telephone service,

8

specialized mobile radio service or other radio common carrier service, or any service for which the called party is charged for the call.

47 U.S.C. § 227(b)(1)(A)(iii).  The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).

In sum, it violates the TCPA to place a non-emergency call to a cellular telephone using an "automatic telephone dialing system" without the "prior express consent" of the called-party. *Knutson v. Reply!, Inc.,* 2011 WL 291076, at *1 (S.D. Cal. Jan. 27, 2011).  As discussed in greater detail below, Congress granted the FCC the authority to "prescribe regulations to implement" these TCPA requirements.  47 U.S.C. § 227(b)(2)(C).

## IV.    ARGUMENT

### A.    The Amended Complaint Is Insufficiently Pleaded and Must Be Dismissed

Federal Rule of Civil Procedure 8 requires that a complaint "must contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. Proc. 8(a)(2).  If a complaint fails to meet that requirement, it must be dismissed pursuant to Rule 12(b)(6) for failure "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

To determine whether a complaint states a claim under the requirements of Rules 8 and 12(b)(6), a court must undertake a two-step analysis.  First, the court must disregard conclusory allegations and bare recitations of the elements of a claim.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  Second, the court must determine whether the well-pleaded factual allegations state a claim that is "plausible," as opposed to merely "possible."  *Iqbal*, 129 S. Ct. at 1950; *Twomby*, 550 U.S. at 556, 570.  If the well-pleaded factual allegations make it just as likely that the defendant is not liable on the asserted claim, then the plaintiff has not shown entitlement to relief and the complaint must be dismissed.  *Iqbal*, *supra*, 129 S. Ct. at 1949-50; *Twombly*, *supra*, 550 U.S. at 570; *Reply!, Inc., supra*, 2011 WL 291076 at *2.

Here, the Amended Complaint must contain well-pleaded factual allegations sufficient to

9

1   demonstrate that it is more likely than not GroupMe used an "automatic telephone dialing

2   system" to send text messages to the cellular telephones of Plaintiff and the other proposed class

3   members.  The only allegation in the Amended Complaint even suggesting GroupMe used such

4   equipment, however, is that the text messages were sent using "equipment and software . . . that,

5   **upon information and belief**, had the capacity to store or produce telephone numbers to be

6   called, using a random or sequential number generator."  Am. Compl., ¶ 55 (emphasis added).

7   That allegation is conclusory; it merely restates the TCPA's definition of an auto-dialer.  *Id.*; 47

8   U.S.C. § 227(a)(1).  It is also made on "information and belief," which is insufficient under Rule

9   8 without supporting, well-pleaded factual allegations.  *Kemp v. Int'l Business Machines Corp.*,

10  2010 WL 4698490, at *4 (N.D. Cal. Nov. 8, 2010).

11          Indeed, the well-pleaded factual allegations in the Amended Complaint do not support

12  its conclusory auto-dialer assertion; they undermine it by alleging that GroupMe's service did

13  not use features characteristic of an auto-dialer in delivering the "Poker" group's text messages.

14  The Amended Complaint alleges that GroupMe "sends" text messages "*en masse*,"

15  "simultaneously" and "at once," not sequentially.  Am. Compl., ¶¶ 10-11.  It alleges GroupMe

16  "trasnsmit[s] text message calls to dozens of people at once" pursuant to the maximum group

17  size of twenty-five people, not to "thousands of customers" at once.  Am. Compl., ¶¶ 10, 12.  It

18  also alleges the telephone numbers to which GroupMe "sends" the text messages are provided

19  to GroupMe by group creators, as opposed to being generated by a machine.  *Id.*, ¶¶ 12-13.

20          Further, while the Amended Complaint attempts to shore up its auto-dialer allegation by

21  characterizing the text messages Plaintiff received from GroupMe as "generic advertisements"

22  written in an impersonal manner, the content of the text messages as pleaded refutes such a

23  characterization.  Am. Compl., ¶¶ 29, 32-39, 56.  According to the Amended Complaint, the

24  first text message Plaintiff received included: Plaintiff's name; the names of the ten other

25  individual members of the group; the customized group name, "Poker," chosen by the group

26  creator; and the telephone number assigned to that group.  *Id.*, ¶ 33.  The subsequent messages

27  from GroupMe similarly were directed to Plaintiff and provided him with helpful information

28  about GroupMe's service, including how to stop receiving the text messages and how to avoid

10

1   text messaging charges. *Id.*, ¶¶ 35, 38-39.

2          The Amended Complaint does not allege the precise contents of all group-initiated text

3   messages Plaintiff received from the "Poker" group and, for those not set forth in the Amended

4   Complaint, merely alleges they were "generic advertisements" written in an impersonal manner.

5   Am. Compl., ¶ 56.  That could not be more inaccurate.  The text messages the other "Poker"

6   group members sent to Plaintiff were personalized, social messages.  Martocci Decl., ¶ 28; RJN,

7   at 4-5.  Plaintiff even used GroupMe's service to respond with his own social message.  *Id.*

8          The Amended Complaint's allegation that GroupMe used an auto-dialer relies entirely on

9   its (1) regurgitation of the TCPA's definition of auto-dialer and (2) mischaracterizations of the

10  nature of the text messages Plaintiff received, which characterizations are contradicted by very

11  contents of the text messages as pleaded and incorporated.  Such conclusory allegations must be

12  disregarded under *Iqbal* and *Twombly*, leaving the Amended Complaint devoid of "sufficient

13  factual matter" to suggest GroupMe used an auto-dialer.  *Lacey v. Maricopa County*, 649 F.3d

14  1118, 2011 WL 2276198, *14 (9th Cir. June 9, 2011); *Reply!, Inc.,* 2011 WL 291076 at *2.

15         Even if the Court finds such allegations to be well-pleaded (which they are not), other

16  well-pleaded allegations make it just as likely GroupMe did not use an auto-dialer.  Taken as

17  true, those other allegations show that GroupMe's service did not deliver text messages to

18  Plaintiff using features characteristic of an auto-dialer (*e.g.*, telephone number generation), and

19  that the text messages themselves were personalized for Plaintiff.  Accordingly, the Amended

20  Complaint must be dismissed under Rule 12(b)(6) because it is either devoid of well-pleaded

21  factual allegations that GroupMe used an auto-dialer, or it contains contradictory well-pleaded

22  factual allegations that make it just as likely GroupMe did not use such equipment.  *Reply!, Inc.*,

23  *supra*, 2011 WL 291076 at *2 (after disregarding conclusory assertions, dismissing TCPA claim

24  where no facts were alleged from which court could infer calls were made using automatic

25  telephone dialing system).

26      **B.      The Court Should Dismiss or Stay this Action Under the Doctrine of Primary**

27              **Jurisdiction**

28         The doctrine of primary jurisdiction allows a court to dismiss a complaint without

1  prejudice, or to stay a proceeding pending the resolution "of an issue within the special

2  competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114

3  (9th Cir. 2008). To invoke the primary jurisdiction doctrine, a court must determine that an

4  "otherwise cognizable claim implicates technical and policy questions that should be addressed in

5  the first instance by the [administrative] agency with regulatory authority over the relevant

6  industry rather than by the judicial branch." *Id.*; *Syntek v. Semiconductor Co., Ltd. v. Microchip*

7  *Tech. Inc.,* 307 F.3d 775, 780 (9th Cir. 2002). While there is no "fixed formula" for applying the

8  doctrine of primary jurisdiction, the Ninth Circuit traditionally considers four factors: "(1) the

9  need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an

10  administrative body having regulatory authority (3) pursuant to a statute that subjects an industry

11  or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in

12  administration." *Clark*, *supra*, 523 F.3d at 1115.

13               1.       Primary Jurisdiction Is Appropriate If a Case Implicates the FCC's

14                         Regulatory Authority Over a Particular Statute

15  Courts have repeatedly invoked the doctrine of primary jurisdiction when faced with

16  issues requiring construction of telecommunications statutes administered by the FCC. *E.g., Id.;*

17  *Pac-West Telecomm., Inc. v. MCI Communications Servs., Inc.*, 2011 WL 1087195, at *2 (E.D.

18  Cal. Mar. 23, 2011); *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459 (6th Cir. 2010); *Total*

19  *Telecomm. Services*, 919 F. Supp. at 478; *Unimat, Inc. v. MCI Telecomms. Corp.*, 1992 WL

20  391421, at *2 (E.D. Pa. Dec. 16, 1992).

21  In *Clark*, for example, the plaintiff alleged the defendant violated 47 U.S.C. § 258(a) by

22  "slamming," or switching, a consumer's telephone service without first obtaining the consumer's

23  consent. *Clark*, *supra*, 523 F.3d at 1112. The statute's prohibitions, however, applied only to

24  "telecommunications carriers" and the defendant, a VoIP provider, argued it did not meet that

25  definition. *Id.* at 1115. The defendant moved to dismiss or stay the action under the primary

26  jurisdiction doctrine, arguing the FCC should be allowed to decide the issue of whether a VoIP

27  provider was subject to the statute's regulations. The defendant argued Congress gave the FCC

28  regulatory authority over telecommunications carriers pursuant to the Telecommunications and

Communications Acts, and the issue of "whether a VoIP provider" is a "telecommunications carrier" had not yet been resolved. *Id.* at 1112.  The district court agreed and dismissed the case without prejudice; the plaintiff appealed. *Id.*

On appeal, the Ninth Circuit, in considering the four factors set forth above, noted that the primary jurisdiction doctrine can be invoked where (1) "a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency," and (2) "protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Clark*, *supra*, 523 F.3d at 1115.  At the time of the lawsuit in *Clark*, Congress had entrusted the FCC with regulatory authority over the telecommunications industry and the FCC had "developed a detailed and comprehensive regulatory scheme in response to the statute's instructions." *Id.* at 1115.  The "emergence of VoIP technology," however, "created new challenges for the FCC . . . as existing regulations did not contemplate the revolutionary changes IP-enabled services entailed." *Id.* at 1113.

In response to the new technology, the FCC issued a Notice of Proposed Rulemaking, seeking comment "on how to define and to regulate all IP-enable services, including VoIP, while maintaining its 'established policy of minimal regulation of the Internet and the services provided over it." *Clark*, *supra*, 523 F.3d at 1113.  The Notice of Proposed Rulemaking specifically solicited comments on "whether VoIP services should be classified as 'telecommunications services." *Id.*  In light of the foregoing, the Ninth Circuit found that the plaintiff's claim raised a "question of first impression" and that the FCC's Notice of Proposed Rulemaking showed the agency was "actively considering" how to resolve it. *Id.* at 1115.  The Ninth Circuit affirmed the district court's ruling, stating that it was "important to federal telecommunications policy" for the FCC to develop a "uniform regulatory framework to confront this emerging technology." *Id.*

### 2.   Congress Has Entrusted the FCC With Comprehensive Regulatory Authority Over the TCPA

In enacting the TCPA, Congress expressed concern that a multiplicity of inconsistent state telemarketing regulations would "frustrate the federal objective of creating uniform national rules." *See* RJN, Ex. H (*In re Rules and Regulations Implementing the Telephone Consumer*

13

1  *Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14415 (July 3, 2003) ("2003

2  Report and Order"), ¶ 83).  Congress wanted to "promote a uniform regulatory scheme under

3  which telemarketers would not be subject to multiple, conflicting regulations" and, therefore,

4  charged the FCC with "prescrib[ing] regulations to implement the requirements" of the TCPA.

5  *Id.*; 47 U.S.C. § 227(b)(2)(C).  As the Sixth Circuit has explained:

6      Congress vested the FCC with considerable authority to implement the [TCPA].
       The Act gives the agency power to "prescribe regulations to implement" the
7      legislation, 47 U.S.C. §§ 227(b)(2), 227(c)(1), 227(c)(2), to exempt calls from the
       requirements of the Act, *id.* §§ 227(b)(2)(B), 227(b)(2)(C), to intervene in suits
8      filed by state attorneys general, *id.* § 227(f)(3), and to enforce the provisions of the
       Act and its accompanying regulations, *see, e.g.,* 22 FCC Rcd 19396 (Nov. 9,
9      2007); 20 FCC Rcd 18272 (Nov. 23, 2005).  In addition to these law-making and
       law-enforcing powers, the FCC has interpretive authority over the . . . Act, *see*
10     *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843-44, 104
       S. Ct. 2778, 81 L. Ed. 2d 694 (1984), and its accompanying regulations, *see Auer*
11     *v. Robbins,* 519 U.S. 452, 461, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997).

12  *Charvat, supra*, 630 F.3d at 466-67.  Further, Congress intended to give the FCC "flexibility to

13  consider what rules should apply to future technologies as well as existing technologies."  *See*

14  RJN, Ex. F (137 Cong. Rec. S18781 at 8 (1991)).

15         According to its Congressionally-granted authority, the FCC has, since 1992, created a

16  complex regulatory TCPA scheme and intermittently adopted regulations addressing particular

17  aspects of the statute.  One such issue the FCC has addressed, in part, is "prior express consent."

18  In 1992, the FCC stated that persons give prior express consent when they "knowingly release

19  their phone numbers;" such persons "have in effect given their invitation or permission to be

20  called at the number which they have given, absent instructions to the contrary."  *See* RJN, Ex.

21  G (*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,

22  Report and Order, 7 FCC Rcd 8752 (September 17, 1992) ("1992 Report and Order"), ¶ 31

23  (citing Congressional record for support)), RJN, Ex. V (*In re Rules and Regulations*

24  *Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, FCC 07-

25  232 (December 28, 2007) ("2007 FCC Ruling"), ¶ 9).

26         District courts, including those in this district, have acknowledged the FCC has the

27  authority to adopt that interpretation of "prior express consent" and district courts lack

28  jurisdiction to challenge it.  *Leckler v. Cashcall, Inc.*, 2008 U.S. Dist. LEXIS 97439, at *6 (N.D.

14

1   Cal. Nov. 21, 2008) (vacating earlier ruling contradicting FCC's interpretation because it was

2   "the agency's final decision interpreting 'prior express consent" and the court lacked

3   jurisdiction to review it); *see, e.g.*, *Greene v. DirecTV*, 2010 U.S. Dist. LEXIS 118270, *2-3

4   (N.D. Ill. Nov. 8, 2010); *Starkey v. Firstsource Advantage, LLC* 2010 U.S. Dist. LEXIS 60955,

5   *13 (Mar. 11, 2010 W.D.N.Y.) ("the proper vehicle" to challenge to FCC's ruling is to "file a

6   petition for review of the FCC's final order in the Court of Appeals").  Nonetheless, the FCC

7   has not yet determined the "precise form," *i.e.*, written or oral, in which "prior express consent"

8   must be obtained, and the statute is silent on the issue.  *See* RJN, Ex. L (*In re Rules and*

9   *Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed

10  Rulemaking, 25 FCC Rcd 1501, 1510 (January 20, 2010) ("2010 Notice of Proposed

11  Rulemaking"), ¶ 17).

12       The FCC has also adopted some regulations implementing the TCPA's prohibition on

13  auto-dialers.  In 1992, the FCC adopted a regulatory definition of auto-dialer that simply copies

14  the TCPA's definition and, in 2003, found that "predictive dialers," which dial numbers at a

15  particular rate to ensure a sales person is available to speak when a customer answers the call,

16  meet that definition.  47 C.F.R. § 64.1200(f); *see* RJN, Ex. H (2003 Report and Order, ¶ 133).

17  The FCC has also found that the TCPA prohibits using "auto-dialers" to send text messages to

18  cellular telephones, but has not revised its 1992 definition of "auto-dialer" and has never defined

19  "automatic telephone dialing system" for purposes of text messaging.  RJN, Ex. H (2003 Report

20  and Order, ¶ 165).

21                    a.      The FCC's Current, Parallel TCPA Proceeding Will Address the

22                          Statute's Consent Requirement

23       On January 22, 2010, the FCC issued it 2010 Notice of Proposed Rulemaking.  The 2010

24  Notice of Proposed Rulemaking recognizes, in relevant part, that the TCPA's Section

25  227(b)(1)(A) creates a defense for auto-dialed calls made with a called-party's "prior express

26  consent," but that the TCPA is "silent regarding the precise form of such consent (*i.e.*, oral or

27  written)."  RJN, Ex. L (2010 Notice of Proposed Rulemaking, ¶ 17).  It also recognizes that the

28  TCPA is silent regarding the content of the consent required to help "ensure that consumers are

1   adequately apprised of the specific nature of the consent that is being given and, in particular, of

2   the fact that they will receive prerecorded calls as a consequence of their agreement."  *Id.*, ¶ 19.

3          The only regulations adopted by the FCC thus far affecting "prior express consent" in

4   the context of calls to cellular telephones are those discussed above, and the FCC is now

5   "seek[ing] comment[s] on whether [it] should conform [its] TCPA rules to the FTC's

6   Telemarketing Sales Rule by . . . requiring sellers and telemarketers to obtain telephone

7   subscribers' express written consent (including electronic methods of consent) to receive

8   prerecorded telemarketing calls."  RJN, Ex. L (2010 Notice of Proposed Rulemaking, ¶ 2).

9   Importantly, the 2010 Notice of Proposed Rulemaking clarifies that the FCC seeks comment

10  regarding the consent required to auto-dial both residential land lines **and "cellular services"**

11  governed by Section 227(b)(1)(A).  *Id.*, ¶ 20 ("any written consent requirement adopted by the

12  Commission should apply to both provision") (emphasis added).

13         In response to the 2010 Notice of Proposed Rulemaking, a number of commentators have

14  urged the FCC to tailor its proposed rules on prior express consent to the underlying purpose of

15  the TCPA – preventing unwanted telemarketing.  Those commentators suggest that the FCC only

16  require written consent, if at all, for "telemarketing' or 'telephone solicitation' calls," as opposed

17  to calls that "do not solicit business."  *See* RJN, Ex. R (Reply Comments of Portfolio Recovery

18  Associates, LLC, CG Docket No. 02-278 at 2 (filed June 21, 2010)); RJN, Ex. O (Notice of *Ex*

19  *Parte* Presentations, CG Docket No. 02-278 by Encore Capital Group, Inc., at 1 (filed May 5,

20  2011) ("Encore Presentation")); RJN, Ex. S (Reply Comments of the Cargo Airline Association,

21  CG Docket No. 02-278 at 2 (filed June 21, 2010) ("CAA Reply Comments")); RJN, Ex. J (*FCC*

22  *Public Notice*, 24 FCC Rcd 13635 (CGB 2009) (seeking comment on a petition for declaratory

23  ruling filed by Club Texting, Inc. on the treatment of text broadcasters under the TCPA)).

24         Other commentators such as the United Parcel Service ("UPS") have similarly asked the

25  FCC to exempt from any written consent requirement those "informational" calls and SMS text

26  messages sent to a called-party "when there is [a] relationship between the call recipient and the

27  party on whose behalf the call is made."  *See* RJN, Ex. T (Comments of the United Parcel

28  Service, Inc. in Response to Global Tel*Link Corporations Petition for Declaratory Ruling at 1

16

1   (filed July 15, 2010) ("UPS Comments")).  The UPS Comments explain that UPS relies on text

2   messaging to send shippers and package recipients delivery notifications; "[t]he telephone

3   numbers used by UPS for . . . delivery notifications are provided by UPS's customer, the shipper,

4   so that the customer and/or the package recipient will be notified of the delivery."  UPS

5   Comments at 3.  It would "be impossible for UPS to obtain prior written consents from the

6   package recipients."  *Id.*

7        In essence, these commentators urge that, if the FCC adopts a rule requiring written

8   consent, that it also recognize a party may have authority to release another's telephone number,

9   thereby consenting on that other party's behalf to receive informational text messages.  *Id.*; *see*

10  *also* RJN, Ex. S ((CAA Reply Comments at 3) (the Commission should "extend[] the exemption

11  from the ban on pre-recorded calls for nonsolicitation commercial calls to encompass cell phone,

12  as well as residential phone calls")).

13               b.     The FCC's Current, Parallel TCPA Proceeding Will Likely Address

14                        What Constitutes An Auto-Dialer

15        A number of commentators have also asked the FCC to refine the definition of automatic

16  telephone dialing system in light of technological advances in the past twenty years.  Wells Fargo

17  Bank, N.A.'s Comment best illustrates the application of this position to the current definition of

18  "auto-dialer," stating that the FCC's identification of certain features that render equipment an

19  "auto-dialer" under the TCPA:

20          [L]eads to the unacceptable result that the definition of "automated telephone
            dialing system" expands without limits as technology advances.  The "capacity to

21          store or produce telephone number," once a rare functionality, has become
            commonplace among numerous consumer electronics products, including the

22          ubiquitous smartphone.  Likewise, businesses use devices that feature a broad
            range of storage and dialing capacities, not all of which might be used in calling

23          campaigns.  If the autodialer restriction is activated by any use of a system with
            this dormant "capacity," then businesses and ordinary consumers are unwittingly

24          violating this law every day.

25  RJN, Ex. U (Comments of Wells Fargo & Co., at 20 (filed May 21, 2010)).  Likewise, JPMorgan

26  Chase & Co. commented:

27          [T]he Commission should reassess its prior decisions and clarify that an automated
            dialing technology must actually use a random or sequential number generator to

28          come within the TCPA definition.  Thus, loading existing customer telephone

17

> numbers onto the equipment without the random or sequential generation and
> dialing capability activated would not be deemed the use of an autodialer.

RJN, Ex. N (Reply Comments of JPMorgan Chase & Co., CG Docket No. 27-278, at 5 (filed

June 21, 2010)); *see also* Encore Presentation at 1.

Several other entities, including the CTIA and the MMA, have raised the same issue in the

context of sending text messages to cellular telephones.  RJN, Ex. P (Reply Comments of CTIA,

CG Docket No. 02-278, at 2-3 (filed June 21, 2010) ("CTIA Reply Comments")); RJN, Ex. Q

(Comments of Sprint Nextel, CG Docket No. 02-278, at 5-6 (filed May 21, 2010)).  The MMA

explained that "[w]hen communicating with a customer through an SMS message, marketers are

limited to 160 character messages;" "marketing through mobile messaging has a very different

user experience than a voice call and therefore terminology, as expressed in the TCPA, does not

apply."  RJN, Ex. W (Comments of the Mobile Marketing Association, CG Docket No. 02-278, at

3 (filed May 21, 2010) ("MMA Comments")).  The MMA further explained that "[t]he

technology used in sending mobile messages is very different than the technology used for pre-

recorded or live voice calls," and urged the FCC to recognize "the distinct method of marketing

via message . . . in relation to their purpose of communicating with customers through electronic

means."  *Id.* at 4.

3.   Uniform Administration of the TCPA Requires Dismissal or A Stay of
This Action Pending Resolution of the Parallel FCC Proceeding

This action squarely presents the Court with the "prior express consent" and "auto-dialer"

issues already before the FCC in its parallel proceeding pursuant to the 2010 Notice of Proposed

Rulemaking.  The Amended Complaint alleges that GroupMe asks text message group creators to

consent to receiving text messages and to obtain similar consent from those individuals they add

to any group.  Am. Compl., ¶ 13.  It alleges four separate times that Plaintiff did not consent to

receiving text messages from his "Poker" group or from GroupMe.  *Id.*, ¶¶ 34, 36, 40-41.  It

further alleges that the text messages Plaintiff did receive "were [sent] *en masse* and without the

prior express consent" of Plaintiff or the other class members "to receive such wireless spam."

*Id.*, ¶ 56.  GroupMe disputes such allegations.

18

1      GroupMe obtained the required "prior express consent" of the called-parties pursuant to

2  the TCPA and the FCC regulations, particularly the 1992 Report and Order which is binding on

3  the Court.  Those individuals who received text messages knowingly released their telephone

4  numbers to GroupMe, either directly when signing up for its service and agreeing to its terms and

5  conditions, or indirectly through the group creators.  The TCPA and the FCC regulations are,

6  however, a blank slate regarding the required form and content of the "prior express consent"

7  necessary to send a text message to a cellular telephone.  The FCC has acknowledged as much

8  and now, to foster uniform application of the TCPA's requirements, seeks to determine those

9  issues for the first time pursuant to its Congressionally-mandated authority to do so.  *See Lyon v.*

10  *Gila River Indian Community*, 626 F.3d 1059, 1075-76 (9th Cir. 2010) (remanding to district

11  court for consideration of dismissal where district court refused to dismiss case under primary

12  jurisdiction doctrine when ongoing proceedings by administrative agency concerned the same

13  issue presented in the litigation), *petition for cert. filed,* 80 U.S.L.W 3058 (U.S. Jul. 15, 2011)

14  (No. 10A1077).

15      The prior express consent issue fits squarely within the Ninth Circuit's holding in *Clark*

16  because it is a threshold issue of first impression; if GroupMe can show it obtained prior express

17  consent from Plaintiff and other proposed class members in whatever form is required, it will not

18  be subject to the TCPA's prohibition against using an auto-dialer and all other issues in this case

19  become irrelevant.  *See Clark, supra*, 523 F.3d at 1114-16 (Time Warner's alleged status as

20  "telecommunications carrier" would decide if it was subject to 47 U.S.C. § 258(a)'s prohibitions

21  against "slamming").  The form and content of the required prior express consent is indisputably

22  within the FCC's Congressionally-granted regulatory authority to regulate the TCPA and has

23  been clearly identified in the 2010 Notice of Proposed Rulemaking as a yet-undecided issue the

24  FCC intends to resolve.

25      Similarly, GroupMe's technology does not constitute an auto-dialer.  It is technologically

26  incapable of storing or producing telephone numbers to be called using a random or sequential

27  number generator.  It is technologically incapable of dialing such numbers.  Martocci Decl., ¶ 16.

28  As alleged in the Amended Complaint, technology such as GroupMe's group texting tool is

19

1   "emerg[ing]," "alternative" and the "newest evolution" of text messaging.  Am. Compl., ¶¶ 7-8,

2   10.  The text messages Plaintiff or any other proposed class member received are initiated by

3   either a group creator or another member of the group.  The group creators provide GroupMe the

4   telephone numbers and the group members provide GroupMe with the text message contents;

5   GroupMe interacts with Twilio to route and deliver those user-initiated text messages over the

6   Internet using long code to their destinations as determined by the group creator.  The FCC has

7   never adapted the definition of auto-dialer to address this kind of group text messaging

8   technology, and not even the industry leading trade organizations have attempted to adopt best

9   practices for such uses of long code.

10       The features currently used by the TCPA and the FCC to describe an "auto-dialer," which

11   were arguably rare when the TCPA was enacted, are now "commonplace among numerous

12   consumer electronics products."  In essence, the definition of auto-dialer is outdated.  For

13   example, a smartphone could be an auto-dialer because it may have the "capacity to store or

14   produce telephone numbers," and someone would, therefore, violate the TCPA by using a

15   smartphone to send any text message, regardless of whether the message is commercial in nature.

16   As highlighted by the Comments submitted to the FCC on this issue, the TCPA's definition of

17   "auto-dialer" is antiquated and unworkable; it cannot consistently be applied by courts to the wide

18   array of new and emerging technologies such as GroupMe's group texting tool, particularly if the

19   TCPA does not distinguish between telemarketing and informational text messages.

20       The "auto-dialer" issue, while not expressly identified for resolution in the 2010 Notice of

21   Proposed Rulemaking, has been raised in an overwhelming number of Comments advancing the

22   same concerns raised in this case and in many others.  The Court is not prevented from invoking

23   the primary jurisdiction doctrine on this issue simply because there is no administrative

24   notification that an agency proceeding pending will address the matter.  *Syntek*, *supra*, 307 F.3d at

25   782.  All that is required is a finding that the issue presented to the Court has not yet been decided

26   and is more properly decided by the administrative agency with the appropriate expertise and

27   regulatory authority to do so.  *Clark*, *supra*, 523 F.3d at 1114.  If Plaintiff thereafter wants the

28   matter resolved, he can pursue administrative remedies before the FCC.  *Syntek*, *supra*, 307 F.3d

20

1   at 782.

2         Any attempt in this litigation to resolve whether GroupMe had "prior express consent" or

3   whether its technology constitutes an "auto-dialer" will deprive the Court and the litigants of the

4   FCC's unique "expertise and experience" in this area.  *Syntex*, 307 F.3d at 781.  It will also create

5   the potential to cause just the type of inconsistent applications of the TCPA Congress sought to

6   avoid, with different courts reaching different determinations over what constitutes sufficient

7   "prior express consent" and which group texting technologies amount to an "automatic telephone

8   dialing system."  The risk for such inconsistencies is very real as there are other GroupMe-type

9   group text messaging services in the marketplace, including Google Huddle, Facebook Messages,

10  Beluga, Fast Society and Google's Disco.  Martocci Decl., ¶ 6.  At least one of those services has

11  already been sued under the TCPA, and numerous other TCPA text message actions are pending

12  where a key issue is whether the technology used constitutes an "auto-dialer."  Declaration of J.

13  Jonathan Hawk ("Hawk Decl."), ¶ 7; *Charvat, supra*, 630 F.3d at 466 ("the volume of [pending]

14  lawsuits heightens the risk that individuals and companies will be subject to decisions pointing in

15  opposite directions").

16        In sum, these issues of first impression should be left to the FCC to decide because of

17  their technical nature, the FCC's unparalleled experience addressing new technologies, Congress'

18  intent to have the FCC adopt regulations on new technologies potentially implicated by the

19  TCPA, and the FCC's current proceeding.  The FCC is in the midst of that decision-making

20  process, and any judicial determination of these questions could be at odds with whatever the

21  FCC decides pursuant to the complex regulatory structure it has implemented for the TCPA.  *See,*

22  *e.g., Clark*, 523 F.3d at 1115; *Brown v. MCI WorldCom Network Servs., Inc.,* 277 F.3d 1166,

23  1172 (9th Cir. 2002).

24      **C.**      **In the Alternative, This Action Should be Transferred to the Eastern District**

25              **of Virginia Pursuant to 28 U.S.C. Section 1404(a)**

26        "For the convenience of [the] parties and witnesses, in the interest of justice, a district

27  court may transfer any civil action to any other district or division where it might have been

28  brought."  28 U.S.C. § 1404(a).  The purpose of Section 1404(a) "is to prevent the waste of

21

GROUPME'S MOTION TO DISMISS, STAY, OR
TRANSFER; 4:11-CV-02584-PJH

1    time, energy and money and to protect litigants, witnesses, and the public against unnecessary

2    inconvenience and expense." *Gerin v. Aegon USA, Inc.*, 2007 WL 1033472, at *3 (N.D. Cal.

3    Apr. 4, 2007) (citations omitted).  The decision to transfer venue under Section 1404(a) is left to

4    a court's discretion.  *See, e.g., PRG–Schultz USA Inc. v. Gottschalks, Inc.,* 2005 WL 2649206,

5    at *2 (N.D. Cal Oct. 17, 2005) (citing *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th

6    Cir. 2000)).

7                            1.      Factors To Consider

8            In determining whether transfer is warranted, a court weighs multiple factors: (a) the

9    plaintiff's choice of forum; (b) the parties' contacts with the plaintiff's chosen forum, including

10   those contacts relating to plaintiff's claim; (c) the location of likely witnesses; (d) the

11   differences in the cost of litigation in the two forums; (e) the availability of compulsory process

12   to compel attendance of unwilling non-party witnesses; (f) the ease of access to sources of

13   proof; and (g) the relative congestion of the two potential forums.  *See, e.g.*, *Jones*, *supra*, 211

14   F.3d at 498-99; *PRG–Schultz, supra*, 2005 WL 2649206, at *2; *Saleh v. Titan Corp.*, 361 F.

15   Supp. 2d 1152, 1156 (S.D. Cal. 2005).

16          "A plaintiff's choice of forum is given 'much less weight' when the plaintiff is **not** a

17   resident of the chosen forum" and even less weight when the plaintiff seeks to bring a putative

18   class action.  *PRG–Schultz*, *supra*, 2005 WL 2649206, at *2 (emphasis added); *see Fabus Corp.*

19   *v. Asiana Express Corp.,* 2001 WL 253185, at *1 (N.D. Cal. Mar. 5, 2001); *Lou v. Belzberg*,

20   834 F.2d 730, 739 (9th Cir. 1987); *see Alexander v. Franklin Res., Inc.*, 2007 WL 518859, at *3

21   (N.D. Cal. Feb. 14, 2007).  Moreover, "[i]f the operative facts have not occurred within the

22   forum … [the plaintiff's] choice is entitled to only minimal consideration," and a court can

23   disregard a plaintiff's choice of forum where it appears he was merely forum-shopping.  *Lou*,

24   *supra*, 834 F.2d at 739; *Alexander*, *supra*, 2007 WL 518859, at *4.

25                          2.      Plaintiff Has No Significant, Relevant Contacts With This District And

26                                  The Court Should Disregard His Choice of Forum

27          The operative facts of this case occurred in Virginia.  Plaintiff is a Virginia domiciliary,

28   received the text messages alleged in the Amended Complaint on his Virginia cellular telephone

                                               22

1   number, and those text messages were initiated by someone else with a Virginia cellular

2   telephone number who added Plaintiff to a GroupMe texting group.  Am. Compl., ¶ 2; *see*

3   Martocci Decl., ¶¶ 28, 30; RJN at 1, 4-5.  Further, Twilio's primary computer servers and

4   GroupMe's only servers utilized to deliver the text messages are located in Virginia.  *See*

5   Martocci Decl., ¶¶ 18, 24-25.

6          The Amended Complaint does not allege any contacts between Plaintiff and California, let

7   alone the Northern District, and there are no allegations that either GroupMe or Twilio does

8   significant business in this district pertaining to the text messages Plaintiff received in April 2011.

9   *See Saleh*, 361 F. Supp. 2d at 1158 (claims had no material connection with state despite the fact

10  defendant was headquartered there where conduct at issue took place elsewhere); *PRG-Schultz*,

11  2005 WL 2649206, at *4 (factor weighed in favor of transfer where no allegation that any events

12  giving rise to action took place in district).  Indeed, the only party to this lawsuit with notable

13  connections to California is Twilio, a Delaware corporation with its headquarters here; GroupMe

14  is a Delaware corporation with its headquarters in New York City.

15         Plaintiff could have filed his lawsuit in the Eastern District of Virginia as he is domiciled

16  there, both GroupMe and Twilio are subject to personal jurisdiction there, and venue would be

17  proper.  28 U.S.C. § 1391(b)(2).  Nonetheless, Plaintiff did not file this lawsuit in his home state

18  despite the obvious connections of his claim to that forum; instead, he sued on behalf of a

19  putative nationwide class across the country in California, which has minimal if any contacts to

20  the parties and Plaintiff's claims.  The Court can and should, therefore, infer that Plaintiff was

21  simply forum shopping and give his choice of this forum little weight, if any.

22              3.      The Locations of Key Witnesses and Evidence Favor Transfer

23         The bulk of Defendants' operations and personnel are physically located on the east

24  coast.  GroupMe's only office is in New York City.  Martocci Decl., ¶¶ 4,19, 22-26.  Decisions

25  pertaining to GroupMe's systems configuration and content were made in New York.  Martocci

26  Decl., ¶ 26.  The underlying computer operations and systems that executed the text messages in

27  question occurred on GroupMe and Twilio's respective systems housed in Virginia.  Martocci

28  Decl., ¶¶ 18, 24.  As discussed above, Plaintiff and his poker buddies, who were part of the

1   "Poker" group and sent him the text messages, used wireless phone numbers with a Richmond,

2   Virginia area code (804), suggesting they all reside there.  Am. Compl., ¶ 33; RJN at 1.

3        If would be significantly more convenient for Plaintiff, GroupMe, and many of the key

4   witnesses if venue were in Virginia.  Plaintiff and the Virginia-based witnesses would already

5   be in the same state as the proceeding, and GroupMe would be located less than a two-hour

6   flight away.  By contrast, if the case proceeds here, Plaintiff, the other "Poker" group members,

7   and GroupMe's personnel will be required to take a five to six-hour flight to San Francisco.

8   Martocci Decl., ¶¶ 22-26; Hawk Decl., ¶¶ 2-6; RJN, Ex . A and at 1.  GroupMe anticipates

9   calling only one witness from California-based Twilio and it will be significantly more

10   convenient for all but that witness if the case proceeds in Virginia.  Hawk Decl., ¶ 3.  This

11   factor, which is of particular significance in considering whether to transfer, favors Virginia.

12   *See* 15 Charles Allan Wright, et al., FEDERAL PRACTICE AND PROCEDURE, JURISDICTION 3d §

13   3851 (3d ed. 2006) ("if some other forum will serve the convenience of witnesses better, a

14   motion to transfer . . . [is] likely to be granted"); Hawk Decl., ¶¶ 2-6.

15                     4.      The Remaining Factors Favor Transfer

16        Cost, availability of compulsory process, ease of access to proof, and the congestion of

17   the respective districts all weigh in favor of transfer.  Given the locations of the parties and

18   witnesses, it would be far less costly to litigate in Virginia.  Most notably, travel time and

19   expenses for key witnesses would be greatly reduced.  RJN, Ex. A.  Also, as key non-party

20   witnesses, such as the members of the "Poker" group, reside in Virginia, they are not subject to

21   compulsory process by this Court and GroupMe would not be able to compel them to testify at

22   trial. Fed. R. Civ. P. 45(b)(2); *Saleh*, 361 F. Supp. 2d at 1160 ("While the convenience of party

23   witnesses is a factor to be considered, the convenience of non-party witnesses is the more

24   important factor") (citations omitted).  Transferring the case to the Eastern District of Virginia

25   would ensure that the parties may invoke the trial court's subpoena power to command the

26   presence of such non-party witnesses.

27        As to the evidence, much of the expected discovery would be on the east coast.  All of

28   GroupMe's documents pertaining to its service are in New York.  Plaintiff and his "Poker"

24

1   group buddies are located in Virginia, as are the servers.  Martocci Decl., ¶¶ 22-26; Hawk Decl.,

2   ¶¶ 2-6; *Saleh*, 361 F. Supp. 2d at 1166 (consideration is convenience of access to proof, not its

3   availability).  Finally, the Eastern District of Virginia's ability to bring a civil case to completion

4   in a significantly shorter amount of time than in the Northern District of California favors

5   transfer.  *See* http://www.uscourts.gov/viewer.aspx?doc=/cgi-bin/cmsd2011Mar.pl (11.5 vs.

6   21.2 months); *Saleh*, 361 F. Supp. 2d at 1167.  The average civil case load of judges in this

7   district is greater than that of judges in the Eastern District of Virginia.  *See id.* (454 cases per

8   judge v. 312 cases).

9                                                   *   *   *

10          The only factor weighing against transfer is Plaintiff's choice of this forum.  That

11  choice, however, should be accorded little, if any, weight because Plaintiff is forum shopping.

12  *Fabus,* 2001 WL 253185, at *2 (granting motion to transfer where only factor against transfer

13  was plaintiff's choice of forum).  The Court should exercise its discretion to transfer this action

14  to the Eastern District of Virginia, Richmond Division, because that forum has a more

15  significant interest in resolving this dispute brought by and involving residents and equipment

16  located in Virginia.  *See B&B Hardware, Inc. v. Hargis Indus., Inc.,* 2006 WL 4568798, at *6

17  (C.D. Cal. Nov. 30, 2006) (interest of justice served by transferring case to forum with greater

18  interest in resolution of the action despite plaintiff's residence in transferor forum).

19  **V.  <u>CONCLUSION</u>**

20          For the foregoing reasons, GroupMe respectfully requests that the Court dismiss the

21  Amended Complaint for failure to state a claim, dismiss or stay the action pursuant to the

22  doctrine of primary jurisdiction, or, in the alternative, transfer the action to the Eastern District

23  of Virginia, Richmond Division.

24  Dated:  October 6, 2011                        WHITE & CASE LLP

25

26                                                 By:    /s/ *Bryan A. Merryman*

27                                                     Bryan A. Merryman
                                                       Attorneys for Defendant
28                                                     GroupMe, Inc.

                                               25

LOSANGELES 928871 (2K)