1   BRYAN A. MERRYMAN (SBN 134357)
bmerryman@whitecase.com
2   J. JONATHAN HAWK (SBN 254350)
jhawk@whitecase.com
3   WHITE & CASE LLP
633 W. Fifth Street, Suite 1900
4   Los Angeles, CA 90071-2007
Telephone: (213) 620-7700
5   Facsimile: (213) 452-2329

6   BIJAL V. VAKIL (SBN 192878)
bvakil@whitecase.com
7   WHITE & CASE LLP
5 Palo Alto Square, 9th Floor
8   3000 El Camino Real
Palo Alto, CA 94306
9   Telephone: (650) 213-0300
Facsimile: (650) 213-8158

10

11   Attorneys for Defendant
GROUPME, INC.

12   **UNITED STATES DISTRICT COURT**

13   **NORTHERN DISTRICT OF CALIFORNIA**

14   **OAKLAND DIVISION**

15   BRIAN GLAUSER, individually and on behalf
of a class of similarly situated individuals,

16

     CASE NO. 4:11-cv-02584-PJH

17           Plaintiffs,

     **DEFENDANT GROUPME, INC.'S**
**MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

18       v.

19   TWILIO, INC., a Delaware corporation; and
GROUPME, INC., a Delaware corporation,

20      Hearing Date: To Be Set
Courtroom: 3

          Defendants.

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page(s)**

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF ISSUE ........................................................................................ 3

III.  BACKGROUND .................................................................................................... 3

    A.    GroupMe ......................................................................................................... 3

        1.    GroupMe's Free Social Text Messaging Service Has Routed Messages Only In Response to Specific Group Member Actions ............................... 4

        2.    The Technologies Used By GroupMe and the API Providers Have Not Generated Random or Sequential Phone Numbers to Dial ......................... 5

    B.    Plaintiff's "Poker" Group ................................................................................ 7

    C.    Procedural History .......................................................................................... 8

IV.   ARGUMENT ........................................................................................................ 9

    A.    The TCPA Restricts the Use of Autodialers ................................................. 10

        1.    Equipment Must Have the Present Capacity at the Time of Use to Generate Random or Sequential Phone Numbers to be an Autodialer ..... 10

        2.    Gragg v. Orange Cab Co., Inc. .................................................................. 12

    B.    GroupMe Has Not Used an Autodialer to Route Plaintiff Text Messages ........... 13

    C.    GroupMe Has Not Used a Predictive Dialer to Route Plaintiff Text Messages ... 16

        1.    The FCC Regulations Regarding Predictive Dialers Do Not Apply to Text Messages .......................................................................................... 16

        2.    GroupMe Has Not Used a Predictive Dialer ............................................. 17

V.    CONCLUSION .................................................................................................... 18

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................... 9

*Asociacion de Trabajadores v. City of Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) ............................................................................ 16

*Buslepp v. Improv Miami, Inc.*,
   No. 0:12-cv-60171-JIC, 2012 WL 4922692 (S.D. Fla. Oct. 16, 2012) ................. 10

*Dominguez v. Yahoo!, Inc.*,
   No. 2:13-cv-01887-MMB, 2014 WL 1096051 (E.D. Pa. Mar. 20, 2014) ........ 11, 13, 16

*Emanuel v. Los Angeles Lakers, Inc.*,
   No. 2:12-cv-9936-GW, 2013 WL 1719035 (C.D. Cal. Apr. 18, 2013) ................. 10

*F.T.C. v. Stefanchik*,
   559 F.3d 924 (9th Cir. 2010) ................................................................................. 9

*Gragg v. Orange Cab Co., Inc.*,
   No. 2:12-cv-00576-RSL, 2014 WL 494862 (W.D. Wash. Feb. 7, 2014) ....... 11, 12, 13, 15, 17

*Gragg v. Orange Cab Co., Inc.*,
   No. 2:12-cv-00576-RSL, 2014 U.S. Dist. LEXIS 29052
   (W.D. Wash. Feb. 28, 2014) ....................................................................... 11, 12, 13, 15

*Griffith v. Consumer Portfolio Srvcs., Inc.*,
   838 F. Supp. 2d 723 (N.D. Ill. 2011) ................................................................... 10

*Hunt v. 21st Mort. Corp.*,
   No. 2:12-cv-2697-WMA, 2013 WL 5230061 (N.D. Ala. Sept. 17, 2013) ........ 11, 13, 16

*Leyse v. Clear Channel Broadcasting, Inc.*,
   545 Fed. Appx. 444 (6th Cir. 2013) ..................................................................... 17

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ............................................................................... 9

*Satterfield v. Simon & Schuster, Inc.*,
   569 F.3d 946 (9th Cir. 2009) ....................................................................... 10, 11, 12

*Sherman v. Yahoo!, Inc.*,
   No. 3:13-cv-0041-GPC, 2014 WL 369384 (S.D. Cal. Feb. 3, 2014) ................... 11

*Stockwell v. Credit Mgmt.*,
   No. 30-2012-005961110, slip op. (Cal. Super. Ct. Oct. 3, 2013) ......................... 12

ii

## STATUTES

47 U.S.C. § 227(a)(1) .......................................................................................... 3, 4, 11, 12

47 U.S.C. § 227(b)(1)(A) ........................................................................................... 10, 13

47 U.S.C. § 227(b)(1)(A)(iii) ........................................................................................... 10

## RULES

Fed. R. Civ. P. 56(c) ........................................................................................................ 9

## REGULATORY MATERIALS

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd 559 (Jan. 4, 2008) ...................................... 16

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, FCC 14-33 (Mar. 27, 2014) ......................................... 7

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, 25 FCC Rcd 1501 (Jan. 22, 2010) .......... 17

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd 14014 (July 3, 2003) ........................... 10, 16

47 C.F.R. 64.1200(f)(2) .................................................................................................. 12

## MISCELLANEOUS

Merriam-Webster Online Dictionary 2014 at http://www.merriam-webster.com/dictionary/capacity .................................................................................. 12

LOSANGELES 1047788 (2K)

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

On April 18, 2011, non-party Mike L. used defendant GroupMe, Inc.'s ("GroupMe") free social group text messaging service to create a group text message conversation among friends so they could arrange times to play poker. Five days later, on April 23, 2011, Mike L., the group creator, provided GroupMe with names and cell phone numbers of six individuals, including plaintiff Brian Glauser ("Plaintiff"), and instructed GroupMe to add those persons to his "Poker" group. Thereafter, Plaintiff and five other people received a text message from Mike L., inviting them to join the group. Plaintiff, within two hours of receiving that initial text message, responded "In," and the group text message conversation continued. Two months later, on June 23, 2011, Plaintiff registered with GroupMe to create and send his own group text messages using its service. Plaintiff remains a member of the "Poker" group today. He has never asked to stop receiving "Poker" group text messages or to be removed from the group.

On May 27, 2011, approximately one month after first participating in the "Poker" group text messaging conversation, Plaintiff filed this putative class action against GroupMe and Twilio, Inc. ("Twilio"), who he dismissed recently, alleging violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 *et seq.* ("TCPA"). Plaintiff alleges GroupMe, without his consent, "spammed" him starting on April 23, 2011, with text messages -- the same text messages he received as part of the "Poker" group. He has received no other text messages outside of the "Poker" group as a result of GroupMe's free service. Plaintiff alleges GroupMe and Twilio sent him "wireless spam" "*en masse*," using an "automatic telephone dialing system" ("autodialer" or "ATDS") as the TCPA defines that term. Am. Compl., Dkt. 34 at ¶¶ 11, 26, 55 (Sept. 15, 2011). Plaintiff's claim lacks merit.

As a threshold matter, the TCPA regulates only certain text messages sent to cell phones if the text messages are sent using an autodialer, defined as "equipment which has capacity to -- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." This definition of autodialer is necessarily limited. In today's world, software, computers, and cell phones can almost always be modified to enable random or

1

1  sequential number generation. The possibilities of modification and alteration are virtually

2  limitless. Accordingly, equipment's "capacity" to perform functionalities regulated under the

3  TCPA is determined as of the time the equipment is used, and it is of no import whether equipment

4  could potentially or theoretically be modified later to add the ability to generate random or

5  sequential phone numbers.

6       Here, GroupMe, Twilio and non-party Bandwidth.com, Inc.'s ("Bandwidth") respective

7  technologies have been used to route the "Poker" group's text messages to Plaintiff. Bandwidth

8  and Twilio have provided GroupMe with software called "application program interfaces," or

9  "APIs" (Twilio and Bandwidth, collectively, the "API Providers"), used in the routing process

10  since Mike L. formed the "Poker" group. GroupMe, in conjunction with these technologies, has

11  not used an autodialer to send Plaintiff the text messages of which he complains. GroupMe and

12  the API Providers' respective proprietary software applications are, and always have been,

13  incapable of autonomously generating random or sequential cell phone numbers, and dialing such

14  numbers.

15       GroupMe and the API Providers' respective proprietary software applications used to

16  facilitate GroupMe's free social group text messaging to the "Poker" group and Plaintiff react

17  entirely to actions by GroupMe users. A GroupMe user is first required to create a GroupMe group.

18  Once a user creates a group, only a group member can add individuals to the group by providing

19  GroupMe with names and cell phone numbers of individuals to add to the group. Group members

20  trigger the transmission and routing of all messages within a group. GroupMe and the API

21  Providers cannot, and have never been able to, route or send text messages to members of a

22  GroupMe group without group members engaging in specific conduct triggering GroupMe and the

23  API Providers to perform those functions. Because GroupMe has not used any technology

24  considered an autodialer to route "Poker" group messages, Plaintiff has no TCPA claim against

25  GroupMe.

26       On January 27, 2012, after Plaintiff filed his Amended Complaint, the Court entered an

27  order staying this action to allow the Federal Communications Commission ("FCC"), the agency

28  authorized by Congress to adopt regulations implementing the TCPA, an opportunity to consider

2

1   three "potentially dispositive" issues in this action.  When the Court lifted the stay on March 27,

2   2014, it granted the request of GroupMe and Twilio to file a summary judgment motion on the

3   autodialer issue as to Plaintiff's individual claim in light of recent precedent.  Plaintiff has since

4   dismissed Twilio.

5          Because GroupMe has not used an autodialer to send text messages to Plaintiff, he has no

6   TCPA claim and cannot maintain this lawsuit as either an individual or a putative class action.  This

7   motion shows GroupMe has <u>not</u> used an autodialer to send Plaintiff text messages as part of the

8   "Poker" group.  For these reasons, GroupMe respectfully requests the Court grant this motion and

9   enter judgment in its favor.

10  **II.     STATEMENT OF ISSUE**

11         1.      Whether GroupMe used an "automatic telephone dialing system," defined under

12  the TCPA as "equipment which has the capacity -- (A) to store or produce telephone numbers to be

13  called, using a random or sequential number generator; and (B) to dial such numbers," 47 U.S.C. §

14  227(a)(1), to send Plaintiff text messages.

15  **III.    BACKGROUND**

16         **A.     GroupMe**

17         Stemming from their desire to create a group messaging system that would allow them to

18  better communicate with each other and friends at music festivals, Jared Hecht and Steve Martocci

19  founded GroupMe in New York City in June 2010.  Declaration of Steve Martocci ("Martocci

20  Decl."), ¶¶ 2-3.  Martocci built the initial prototype of GroupMe based on a simple idea -- create the

21  easiest way for people to start conversations using cell phones and keep in touch with their families,

22  friends and real life networks using private Short Message Service ("SMS") groups.  *Id.*, ¶¶ 3-4.

23  When they created GroupMe, it filled a void in the group text messaging space, enabling groups of

24  people using different cell phone platforms to participate in a group text message exchange

25  displayed to all group members as a single conversation, *i.e.*, a "thread."  *Id.*, ¶ 3.

26         Since its founding, a wide range of real life networks have used GroupMe's free text

27  messaging service to communicate, including cancer support groups, student organizations,

28  neighborhood watch groups, and family and emergency medical services trying to stay in touch

3

1    with one another during natural disasters. Martocci Decl., ¶¶ 5-7. The most common group names
2    on the service have been "Mom" and "Dad." *Id.*, ¶ 8.

3              **1.**        **GroupMe's Free Social Text Messaging Service Has Routed Messages**
4                           **Only In Response to Specific Group Member Actions**

5           Since at least April 18, 2011, when Mike L. created the "Poker" group, a new user seeking
6    to create a group has been able to register for GroupMe by filling out a registration form on either
7    GroupMe's website or smartphone application ("app"), providing GroupMe his or her name, cell
8    phone number, and other information. Martocci Decl., ¶ 10; Declaration of John Pignata ("Pignata
9    Decl."), ¶ 3. GroupMe verifies the new user owns the cell phone number he or she submits.
10   Martocci Decl., ¶¶ 10-11; Pignata Decl., ¶ 3. Once the new user completes the registration process,
11   the user can create and name his or her group using GroupMe's website or smartphone app, and
12   include up to fifty other individuals in the group (formerly twenty-five individuals) by manually
13   entering on the website or app their names and cell phone numbers. Martocci Decl., ¶¶ 12-14;
14   Pignata Decl., ¶ 3. An individual can also create a group using SMS directly. Martocci Decl., ¶ 13;
15   Pignata Decl., ¶ 3. Group members other than the creator can add new individuals to the group by
16   providing GroupMe with each individual's name and cell phone number, and entering a command
17   that he or she be added. Martocci Decl., ¶ 13; Pignata Decl., ¶ 3.

18          Importantly, only a group creator or other group members have been able to add new
19   people to a group by manually entering names and cell phone numbers of those people on the
20   GroupMe website or smartphone app, or add them via SMS in conjunction with a command to
21   include them in the existing group. Martocci Decl., ¶ 14; Pignata Decl., ¶ 3.

22          When a GroupMe user adds an individual to his or her existing GroupMe group, the user
23   triggers a specific response from GroupMe. Martocci Decl., ¶¶ 15-18; Pignata Decl., ¶ 3. The
24   user's addition of a new person to the group causes GroupMe to send the new member a push
25   notification if the new member has GroupMe's smartphone app, informing the new member he or
26   she was added to a particular group. *Id.* If the new user does not have the GroupMe smartphone
27   app, the user's addition of a new member causes GroupMe to send the new member's cell phone
28   number a welcome message via SMS. *Id.* The welcome message, like the push notification, is a

4

1  customized message informing the new member he or she has been added to a GroupMe group and

2  provides the name of the group, the name of the group creator, the name of the group member who

3  added the new member (if different from the group creator), and the names of other group

4  members. *Id.*  The welcome message sent to SMS users also provides instructions on how to

5  download the GroupMe smartphone app to avoid any potential data charges, exit the group and stop

6  receiving GroupMe messages. *Id.*  Because the SMS protocol limits each text message to 160

7  characters, the welcome message may be split into two messages for delivery.  Martocci Decl.,

8  ¶ 17; Pignata Decl., ¶ 3.

9        Following receipt of a welcome message or push notification, GroupMe group members

10  receive messages other members send to the group through either the smartphone app or SMS.

11  Martocci Decl., ¶ 19; Pignata Decl., ¶ 3.  GroupMe routes group messages to group members only

12  when other group members send those messages.  Martocci Decl., ¶¶ 19, 24; Pignata Decl., ¶ 3.

13  Moreover, as with the welcome message, any informational messages from GroupMe to group

14  members are triggered solely in response to specific actions of other group members.  Martocci

15  Decl., ¶¶ 20-24; Pignata Decl., ¶ 3.  For example, informational messages informing a group

16  member that he or she has been removed from a group due to inactivity are sent only if other group

17  members send a specified number of messages to the member and the member never responds. *Id.*

18  GroupMe has functioned this way since at least April 18, 2011, when Mike L. created the "Poker"

19  group.  Martocci Decl., ¶¶ 9-29; Pignata Decl., ¶ 3.

20        **2.        The Technologies Used By GroupMe and the API Providers Have Not**

21                 **Generated Random or Sequential Phone Numbers to Dial**

22        The applications GroupMe and the API Providers have used since at least April 18, 2011,

23  have been capable of routing group messages and informational messages to GroupMe group

24  members only in response to interactions between those members.  Martocci Decl., ¶¶ 24-29;

25  Pignata Decl., ¶ 3; Declaration of Ameer Badri ("Badri Decl."), ¶¶ 4-9; Declaration of Brent Mello

26  ("Mello Decl."), ¶¶ 4-9.  Specifically, GroupMe performs these functions using its proprietary

27  software application, as modified.  Martocci Decl., ¶ 9; Pignata Decl., ¶ 3.  To ensure delivery of

28  SMS messages to cell phones of group members, GroupMe's proprietary software application also

5

1   has worked with APIs from Twilio and Bandwidth. *Id.*

2       When a registered GroupMe user creates a group, GroupMe's proprietary software obtains

3   a unique ten-digit phone number from Twilio or Bandwidth and assigns the number to the particular

4   group. Martocci Decl., ¶ 15; Pignata Decl., ¶ 3. GroupMe's proprietary software associates the cell

5   phone numbers of the group's individual members with the unique ten-digit number, and routes all

6   messages within the group through that ten-digit number. *Id.* All messages within a particular

7   group are displayed to members as sent to and received from the unique ten-digit number. *Id.*

8   Twilio and Bandwidth's APIs are and were software programs serving as the conduit between

9   GroupMe and the traditional telecommunications infrastructure. GroupMe uses Twilio and

10   Bandwidth's APIs to route group messages to SMS users. Martocci Decl., ¶ 9; Pignata Decl., ¶ 3;

11   Badri Decl., ¶¶ 4-9; Mello Decl., ¶¶ 4-9.

12       Twilio and Bandwidth's APIs play no part, and never have played a part, in generating,

13   storing, or influencing cell phone numbers associated with GroupMe groups, and the API Providers

14   have never influenced the content of messages delivered to GroupMe group members. Badri Decl.,

15   ¶¶ 8-9; Mello Decl., ¶¶ 4-9. Twilio and Bandwidth's APIs merely enable transmission of SMS

16   messages and access to transmission services provided by traditional telecommunications networks.

17   *Id.*

18       GroupMe and the API Providers' respective software applications have reacted entirely to

19   actions by group members. The technologies GroupMe and the API Providers have used since

20   April 18, 2011, do <u>not</u> possess, and never have possessed, the capacity to generate random or

21   sequential phone numbers. Martocci Decl., ¶¶ 24-29; Pignata Decl., ¶ 3; Badri Decl., ¶ 8; Mello

22   Decl., ¶ 8. GroupMe and the API Providers' technologies have <u>not</u> been able to dial randomly or

23   sequentially generated numbers. *Id.* GroupMe and the API Providers' technologies have <u>not</u> been

24   programmed to generate content or to engage in random messaging. *Id.* To this end, GroupMe has

25   never sent any "blast" SMS text messages to all GroupMe users, and is technologically incapable of

26   doing so. Martocci Decl., ¶ 26; Pignata Decl., ¶ 3. All messages, delivered to no more than twenty-

27   five or fifty people at a time (the maximum group sizes set since GroupMe was founded), have been

28   triggered solely in response to actions by group creators and members. Martocci Decl., ¶¶ 23-24,

28; Pignata Decl., ¶ 3.

This is consistent with GroupMe's purpose. GroupMe is not, and never has been, a marketing service or tool. GroupMe has implemented policies and procedures intended to prevent individuals from using the service for marketing purposes, including rules prohibiting spamming, limiting the size of each group, and limiting the number of groups that could be created from the same IP address. Martocci Decl., ¶ 28; Pignata Decl., ¶ 3. GroupMe also limits the content it provides to users to informational messages that would be helpful, such as advising each group member that he or she has been added to a group, how to be removed from the group, and if the user does not participate in a group that he or she will be removed from the group. Martocci Decl., ¶ 17; Pignata Decl., ¶ 3.

Indeed, the FCC ruled last month that GroupMe users received informational text messages solely in response to user actions, and those text messages were not "telemarketing" text messages, but rather were communications group members "expected and desired" when they joined a GroupMe group. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, FCC 14-33 ¶¶ 8-10 (Mar. 27, 2014). The FCC further noted, as of March 27, 2014, it had received "only one" complaint regarding GroupMe sending informational text messages to group members, "suggest[ing] a significant number of consumers are receiving GroupMe messages to which they had consented." *Id.*, ¶ 9.

**B.      Plaintiff's "Poker" Group**

On April 18, 2011, Mike L. registered for GroupMe and created a group he named "GroupMe Chat." Martocci Decl., ¶ 30. Mike L.'s "GroupMe Chat" group initially had at least one other member. *Id.* On April 23, 2011, Mike L. renamed the group "Poker," and added six more individuals to the group, including Plaintiff. *Id.* Mike L. provided GroupMe with Plaintiff's name and cell phone number when adding Plaintiff to the group. *Id.*

When Mike L. added Plaintiff to the "Poker" group, Mike L. triggered GroupMe's software application to send Plaintiff's cell phone a welcome message via SMS. Martocci Decl., ¶¶ 17, 31. The welcome message specified Mike L. added Plaintiff to the "Poker" group, and there was at least one other person, "Richard L[.]," in the group. *Id.*, ¶ 31. The welcome message sent to Plaintiff also

7

1  notified him that he could download the GroupMe smartphone app to avoid any potential data

2  charges, how to exit the group, and how to not receive future group text messages. *Id.*, ¶ 31.  The

3  welcome message, because it exceeded the 160-character limit set by SMS, was sent in two

4  messages. *Id.*, ¶¶ 17, 31.

5          After Plaintiff received the welcome message, he received seven social messages from

6  other group members, but did not respond to any of them.  Martocci Decl., ¶ 31.  By sending the

7  seventh message, another group member triggered GroupMe's software application to send Plaintiff

8  an informational message informing him that he would be removed from the group if he continued to

9  not respond. *Id.*, ¶¶ 20-22, 31.  Other group members sent Plaintiff five more social messages, the

10  fifth of which triggered GroupMe to send Plaintiff another informational message stating he was

11  removed from the group, but could rejoin if he responded to the SMS message. *Id.*  Plaintiff, twenty

12  minutes after being removed from the "Poker" group, responded "In." *Id.*, ¶ 31.  "Poker" group

13  members exchanged all of the foregoing messages on April 23, 2011. *Id.*

14          On June 23, 2011, Plaintiff registered for a GroupMe account and accepted GroupMe's

15  terms and conditions, although Plaintiff has never been a member in any GroupMe group other than

16  the "Poker" group.  Martocci Decl., ¶ 31; Pignata Decl., ¶¶ 5-7.  Notably, the "Poker" group

17  members continued to send messages to one another through December 10, 2013.  Pignata Decl.,

18  ¶¶ 5-7.  The "Poker" group still exists, and Plaintiff remains a member. *Id.*  Plaintiff has never

19  texted "STOP" to stop receiving group messages, or asked to leave the group. *Id.*

20          **C.    Procedural History**

21          The Amended Complaint, which is the operative complaint, alleges Plaintiff received

22  unsolicited text messages from GroupMe and Twilio starting on April 23, 2011, as part of the

23  "Poker" group that "included advertisements about [GroupMe's] service and mobile application that

24  were written in an impersonal and generic manner and came from a phone number assigned solely to

25  transmit such text message calls."  Am. Compl., ¶ 56.  The Amended Complaint alleges GroupMe

26  and Twilio violated the TCPA because they sent those messages using "equipment and software

27  [with] the capacity to store or produce telephone numbers to be called, using a random or sequential

28  number generator." *Id.*, ¶¶ 55-56.

8

LOS ANGELES 1047788 (2K)

The Amended Complaint purports to bring this case as a putative class action against GroupMe and Twilio for allegedly "harvest[ing] all phone numbers added by group creators in order to independently send [their] own text message advertisements promoting [their] service and mobile applications." Am. Compl., ¶ 27.  The Amended Complaint alleges GroupMe and Twilio sent such messages "to large groups of people *en masse*" using a "random or sequential number generator," and seeks to certify two classes of plaintiffs.  *Id.*, ¶¶ 11, 43, 54-60 (emphasis in original).  The Amended Complaint prays for statutory damages of $500 per text message sent, trebled to $1,500 per text message in the Court's discretion.  *Id.*, ¶¶ 43, 54-60.

On January 27, 2012, the Court entered an order staying this action under the primary jurisdiction doctrine to provide the FCC an opportunity to resolve three TCPA issues "potentially dispositive" here, including "who qualifies as an auto-dialer subject to the TCPA."  Order, Dkt. 73 at 3 (Jan. 27, 2012).  In lifting the stay on March 27, 2014, the Court allowed GroupMe and Twilio to file a summary judgment motion on whether their technologies as used to send Plaintiff text messages fall within the definition of an autodialer.  Civ. Min., Dkt. 93 at 1 (Mar. 28, 2014).  Plaintiff dismissed Twilio without prejudice on April 21, 2014, pursuant to a stipulation of all parties.  Stipulated Dismissal of Twilio, Inc., Dkt. 105 (Apr. 21, 2014).

## IV.   ARGUMENT

A summary judgment motion should be granted where the evidence shows no genuine dispute exists as to any material fact.  Fed. R. Civ. P. 56(c).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A moving party without the ultimate burden of persuasion at trial may carry its burden of production on summary judgment by producing evidence negating an essential element of the non-moving party's claim.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  A party opposing a summary judgment motion may not rest upon conclusory assertions, speculative testimony, or mere denials, but must "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in his favor."  *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2010).

LOSANGELES 1047788 (2K)

1    Here, Plaintiff has the ultimate burden of persuasion at trial on his TCPA claim to show

2    GroupMe used an autodialer to send him text messages. *Buslepp v. Improv Miami, Inc.*, No. 0:12-

3    cv-60171-JIC, 2012 WL 4922692, at *2 (S.D. Fla. Oct. 16, 2012). GroupMe's evidence

4    conclusively negates the autodialer element of Plaintiff's TCPA claim, and judgment should be

5    entered in favor of GroupMe.

6    **A.      The TCPA Restricts the Use of Autodialers**

7    The TCPA prohibits sending certain types of text messages to cell phones only if the text

8    messages are sent using an "autodialer." 47 U.S.C. § 227(b)(1)(A)(iii); *Satterfield v. Simon &*

9    *Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). In relevant part, the TCPA provides, "[i]t shall be

10   unlawful for persons within the United States --

11   > (A) to make any call (other than a call for emergency purposes or
12   > made with the prior express consent of the called party) using any
     > automatic telephone dialing system or artificial or prerecorded
13   > voice –

14   > * * *

15   > (iii) to any telephone number assigned to a paging service, cellular
     > telephone service, specialized mobile radio service or other radio
16   > common carrier service, or any service for which the called party is
     > charged for the call.

17   *Id.*[1] (emphasis added). The plain language of the statute makes clear the TCPA does not regulate a

18   text message sent to a cell phone unless the text message is sent using an autodialer. *Id.* The TCPA

19   specifically defines "autodialer."

20   **1.       Equipment Must Have the Present Capacity at the Time of Use to**

21   **Generate Random or Sequential Phone Numbers to be an Autodialer**

22   The TCPA does not prohibit the outright use of automated equipment to send text messages

23   to cell phones. *See Griffith v. Consumer Portfolio Srvcs., Inc.*, 838 F. Supp. 2d 723, 725 (N.D. Ill.

24   2011); *Emanuel v. Los Angeles Lakers, Inc.*, No. 2:12-cv-9936-GW(SHx), 2013 WL 1719035, at *3

25   _____

26   [1] The TCPA's terms prohibit "mak[ing] any call" using an autodialer, but the Ninth Circuit and
     the FCC have held a text message is a "call" for purposes of the TCPA's restrictions on
27   autodialers. 47 U.S.C. § 227(b)(1)(A); *Satterfield*, 569 F.3d at 952 (citing *In re Rules and*
     *Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18
28   FCC Rcd 14014, 14115 ¶ 165 (July 3, 2003) ("2003 Report and Order")).

10

1 (C.D. Cal. Apr. 18, 2013).  Equipment is an autodialer under the TCPA only if it is capable of

2 performing specified functions.  47 U.S.C. § 227(a)(1); *Satterfield*, 569 F.3d at 951.  An autodialer

3 must have "the capacity -- (A) to store or produce telephone numbers to be called, using a random or

4 sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  Without these

5 capabilities, equipment is not an autodialer and not regulated by the TCPA.  *See Dominguez v.*

6 *Yahoo!, Inc.*, No. 2:13-cv-01887-MMB, 2014 WL 1096051, at *5-6 (E.D. Pa. Mar. 20, 2014).

7       Importantly, whether equipment can randomly or sequentially generate phone numbers

8 under the TCPA is determined based on the equipment's actual capabilities at the time of use, *i.e.*,

9 the equipment's "present capacity."  *See Gragg v. Orange Cab Co., Inc.*, No. 2:12-cv-00576-RSL,

10 2014 WL 494862, at *2 (W.D. Wash. Feb. 7, 2014).  To be an autodialer, equipment must be

11 capable at the time of use of autonomously generating "random sequences of [ten] digit[]" phone

12 numbers or autonomously generating sequential sets of ten-digit phone numbers, *e.g.*, "(111) 111-

13 1111, (111), 111-1112, and so on."  *Id.* at *3 (citations omitted); *Dominguez*, 2014 WL 1096051, at

14 *5-6; *Hunt v. 21st Mort. Corp.*, No. 2:12-cv-2697-WMA, 2013 WL 5230061, at *3-4 (N.D. Ala.

15 Sept. 17, 2013).  If equipment lacks the present capacity to generate random or sequential phone

16 numbers, and to dial those numbers, it is not an autodialer and it is irrelevant whether the equipment

17 could potentially or theoretically be modified to add those functionalities.  *Id.* [2]

18

19     [2] The courts to consider this issue most recently, *Gragg* and *Dominguez*, rejected the argument

20 that equipment without the present capacity to generate random or sequential numbers constitutes
an autodialer.  While at least one non-binding authority, *Sherman v. Yahoo!, Inc.*, No. 3:13-cv-

21 0041-GPC, 2014 WL 369384, at *7 (S.D. Cal. Feb. 3, 2014), accepted that argument before
*Dominguez* and *Gragg* were decided, *Dominguez* considered the same service offered by the

22 same defendant (Yahoo!) and came out the other way.  *See Dominguez*, 2014 WL 1096051, at *5-

23 6.  Further, *Gragg* directly addressed and rejected the reasoning applied in *Sherman* after the
court in *Gragg* granted summary judgment for defendants.  *Gragg v. Orange Cab Co., Inc.*, No.

24 2:12-cv-00576-RSL, 2014 U.S. Dist. LEXIS 29052, at *4-6 (W.D. Wash. Feb. 28, 2014) ("*Gragg*

25 *II*").  In denying plaintiff's motion for reconsideration, which raised the *Sherman* opinion to argue
summary judgment on the autodialer issue should not have been granted, the court in *Gragg II*

26 held "*Sherman* wants to sweep within the definition of an ATDS any hardware that could, if
programmed differently, send the kind of automated messages that Congress found objectionable

27 when it enacted the TCPA.  This argument is not consistent with the language of the statute and
its impacts would be untenable."  *Id.* at *6.  *Sherman* was decided incorrectly.

28

LOSANGELES 1047788 (2K)

1    The focus on the equipment's present capacity is consistent with the plain language of the

2    statute and FCC regulations.  Congress wrote the TCPA in "present tense," referring to an autodialer

3    as equipment which "has the capacity" to perform the specified functionalities.  47 U.S.C. §

4    227(a)(1) (emphasis added); *Gragg*, 2014 WL 494862, at *2.  Moreover, "capacity" means "the

5    ability to do something," not the "potential" ability to do something.  "Capacity," Merriam-Webster

6    Online Dictionary 2014 at http://www.merriam-webster.com/dictionary/capacity (Apr. 23, 2014);

7    *Gragg II*, 2014 U.S. Dist. LEXIS 29052, at *2-3 n.2 (interpreting "capacity" to mean "'is capable

8    of,' not 'could be capable of' or 'has the potential to be capable of'").  The FCC's regulations

9    implementing the TCPA have, since 1992, adopted verbatim the present tense statutory definition of

10   "autodialer" as written by Congress.  *See* 47 C.F.R. 64.1200(f)(2).

11   The plain language of the TCPA, FCC regulations, and court decisions make clear, the

12   TCPA regulates equipment based on what the equipment can actually do at the time of use, not what

13   it could theoretically do after modification or alteration.[3]  *See also Stockwell v. Credit Mgmt.*, No.

14   30-2012-005961110, slip op. at 2 (Cal. Super. Ct. Oct. 3, 2013).  *Gragg* is illustrative.

## 2.     *Gragg v. Orange Cab Co., Inc.*

16   In *Gragg*, plaintiff called a taxi company and requested cab service.  *Gragg*, 2014 WL

17   494862, at *1.  Using information plaintiff provided to the dispatcher during his call, the taxi

18   company's proprietary software program generated and transmitted a customized text message to

19   plaintiff's cell phone informing him when a cab was on its way to pick him up.  *Id.*  The customized

20   text message plaintiff received, which included a link to download a smartphone app for requesting

21   future taxis from the cab company, was transmitted to plaintiff only after a cab driver physically

22   clicked a button on a device in his cab "accept[ing]" plaintiff's request for a cab.  *Id.*  Plaintiff sued

23   the cab company and the maker of the software program under the TCPA for allegedly using an

24   autodialer to send him an unauthorized text message.  *Id.*

---

[3] As the Ninth Circuit noted in *Satterfield*, "[a] system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do so." *Satterfield*, 569 F.3d at 951.  Nonetheless, "[n]othing in *Satterfield* [] supports, much less requires, an interpretation of the word 'capacity' to mean anything more than 'is capable of.'" *Gragg II*, 2014 U.S. Dist. LEXIS 29052 at *6.

12

1    Defendants moved for summary judgment on plaintiff's TCPA claim, presenting evidence
2  the system used to deliver the text message to plaintiff did not, at the time the text message was
3  sent, have the capacity to generate random or sequential phone numbers. *Gragg*, 2014 WL 494862,
4  at *2-3.  Plaintiff opposed the motion, arguing the system's inability to autonomously generate
5  random or sequential phone numbers was irrelevant as long as the program "could be programmed
6  differently" to achieve those functionalities. *Gragg II*, 2014 U.S. Dist. LEXIS 29052, at *3.  The
7  parties' dispute turned on what it means for equipment to have the "capacity" to autodial.

8    In ruling on the motion, the *Gragg* court reasoned that adopting a broad interpretation of
9  "capacity" with a focus on technology's "<u>potential</u> capacity to store or produce and call telephone
10 numbers using a random number generator" would "capture many of contemporary society's most
11 common technological devices within the statutory definition [of an ATDS]." *Gragg*, 2014 WL
12 494862, at *2.  This would "lead to an absurd result," "subject[ing] virtually all calls and text
13 messages to the TCPA, since most modern computing systems and cell phones would, if properly
14 programmed, be capable of storing telephone numbers and dialing them automatically if given a
15 pre-defined trigger." *Id.*; *Gragg II*, 2014 U.S. Dist. LEXIS 29052, at *3.  The court granted
16 defendants' motion, finding that, to be an autodialer, equipment must have the actual capacity at the
17 time of use to generate random or sequential phone numbers. *Gragg*, 2014 WL 494862, at *3.

18    Other courts analyzing the same issue recently have similarly held equipment is <u>not</u> an
19 autodialer simply because it "could be, but was not, paired with software that would enable it to"
20 randomly or sequentially generate phone numbers. *Dominguez*, 2014 WL 1096051, at *5-6; *Hunt*,
21 2013 WL 5230061, at *3-4.[4]

22   **B.    <u>GroupMe Has Not Used an Autodialer to Route Plaintiff Text Messages</u>**

23    Since at least April 18, 2011, GroupMe, using either Twilio or Bandwidth's API, has

---

24   [4] *Hunt* echoed the reasoning in *Gragg* and *Gragg II*, noting, "in today's world, the possibilities of
25 modification and alteration are virtually limitless.  For example, it is virtually certain software
   could be written, without much trouble, that would allow iPhones 'to store or produce telephone
26 numbers to be called, using a random or sequential number generator, and to call them.'  Are the
   roughly 20 million American iPhone users subject to the mandates of § 227(b)(1)(A) of the
27 TCPA?  More likely, only iPhone users who were to download this hypothetical 'app' would be
28 at risk." *Hunt*, 2013 WL 5230061, at *4.

13

LOSANGELES 1047788 (2K)

1  provided a free social text messaging service that reacts entirely and only based on actions by

2  group members. Martocci Decl., ¶¶ 9-29; Pignata Decl., ¶ 3. Group creators set up groups and

3  choose group names. Martocci Decl., ¶¶ 12-13; Pignata Decl., ¶ 3. Group members decide who

4  to include in their groups, and provide GroupMe with names and cell phone numbers for those

5  individuals along with instructions to add them to designated groups. Martocci Decl., ¶ 14;

6  Pignata Decl., ¶ 3. Group members, by their conduct, decide when text messages are sent.

7  Martocci Decl., ¶¶ 9-29; Pignata Decl., ¶ 3. GroupMe cannot, and has never been able to,

8  autonomously perform those tasks, and the API Providers have been mere conduits for delivering

9  SMS messages as instructed by group members. Martocci Decl., ¶¶ 23-29; Pignata Decl., ¶ 3.

10  The capabilities of GroupMe and the API Providers' software used to facilitate GroupMe's free

11  group text messaging service since at least April 18, 2011, are on all fours with the technology

12  analyzed in *Gragg*.

13       As in *Gragg*, GroupMe and the API Providers did <u>not</u> generate Plaintiff's cell phone

14  number randomly or sequentially. Martocci Decl., ¶¶ 25-26, 30. Mike L., the creator of the

15  "Poker" group, provided GroupMe with Plaintiff's name and cell phone number, and Mike L.

16  instructed GroupMe to add Plaintiff to the "Poker" group. *Id.* Thereafter, Plaintiff received all

17  text messages of which he complains because other "Poker" group members (likely Plaintiff's

18  friends based on the social conversation) caused them to be sent. *Id.*, ¶¶ 9-31.

19       Just as importantly, GroupMe and the API Providers have never been capable of actually

20  generating phone numbers randomly or sequentially. Martocci Decl., ¶¶ 23-29; Pignata Decl.,

21  ¶ 3; Badri Decl., ¶¶ 4-9; Mello Decl., ¶¶ 4-9. GroupMe and the API Providers need to receive and

22  process manual inputs from group users before any of the functions described above can be

23  performed. *Id.* Absent manual inputs from group members, GroupMe and the API Providers

24  have never been able to route or send group messages to them. *Id.* Indeed, absent manual inputs

25  from group members, there can be no GroupMe groups or any group members. *Id.* These same

26  technological limitations formed the basis for the decision in *Gragg* that defendants' system was

27  <u>not</u> an autodialer simply because it generated and sent a text message to plaintiff in response to

28  plaintiff's conduct and could potentially be reprogrammed to generate random or sequential

14

1 | numbers in the future. *Gragg*, 2014 WL 494862, at *2-3.

2 |      The facts of this case belie Plaintiff's allegations that GroupMe harvested cell phone

3 | numbers and initiated wireless spam advertisements to those numbers via mass text messages.

4 | Am. Compl., ¶ 27. GroupMe and the API Providers have not used an autodialer to send Plaintiff

5 | text messages because their respective software applications have never been able to generate

6 | random or sequential cell phone numbers to dial. Martocci Decl., ¶¶ 23-29; Pignata Decl., ¶ 3;

7 | Badri Decl., ¶¶ 4-9; Mello Decl., ¶¶4-9; *Gragg*, 2014 WL 494862, at *2-3. This should end the

8 | analysis. GroupMe has always lacked the capacity to autodial. *Gragg II*, 2014 U.S. Dist. LEXIS

9 | 29052, at *3. Plaintiff's TCPA claim must fail.

10 |      In any event, re-writing GroupMe or the API Providers' software applications to add

11 | number generation and random messaging functionalities would constitute substantial

12 | modifications. GroupMe was founded to facilitate personal communications between small

13 | groups of friends, family, and real life social networks, not as a marketing tool. Martocci Decl.,

14 | ¶¶ 2-8. Re-writing GroupMe's software to add random or sequential phone number generation

15 | capabilities or the ability to engage in random messaging would likely alienate GroupMe's social

16 | users, its core constituency, and completely transform GroupMe's public image. *Id.*, ¶ 28. The

17 | API Providers similarly would gain nothing from adding number generation capabilities because

18 | they are not, and never have been, responsible for deciding the ultimate destinations for messages

19 | routed using their APIs. Badri Decl., ¶¶ 4-9; Mello Decl., ¶¶ 4-9. Modifying GroupMe and the

20 | API Providers' respective software applications to add number generation capabilities would alter

21 | their core functions. *Id.*; Martocci Decl., ¶¶ 28, 29.

22 |      Moreover, for GroupMe and the API Providers to interact autonomously with

23 | individuals via GroupMe's text message service, modifications to their respective software

24 | applications would need to be more extensive than simply writing a few lines of software code to

25 | add autodialing capabilities. Martocci Decl., ¶ 29; Pignata Decl., ¶ 3. Someone would have to

26 | write new code enabling GroupMe or the API Providers to autonomously generate random or

27 | sequential cell phone numbers, generate content to transmit to those numbers, assign the numbers

28 | to separate groups to comply with the group size limitation or remove GroupMe's limitation on

15

1   group size altogether, and transmit content to the numbers. *Id.*; Badri Decl., ¶¶ 4-9; Mello Decl.,

2   ¶¶ 4-9. No one at GroupMe has written such code, and learning to do so would be a significant

3   undertaking. Martocci Decl., ¶ 29; Pignata Decl., ¶ 3.

4         Even if the ability to modify technologies is a relevant factor in the autodialer analysis

5   (which it is not), the modifications required of the respective software applications of GroupMe

6   and the API Providers are too significant to fall within the well-reasoned definition of "present

7   capacity" in *Gragg*, *Hunt*, and *Dominguez*. To find otherwise would remove all limitations on

8   what constitutes an autodialer in light of the ability to alter software, computing systems, and cell

9   phones.

10       **C.**    **GroupMe Has Not Used a Predictive Dialer to Route Plaintiff Text Messages**

11         According to the FCC, certain equipment referred to as a "predictive dialer falls within the

12   meaning and definition of autodialer" under the TCPA. *In re Rules and Regulations Implementing*

13   *the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd 559, 565 ¶ 13

14   (Jan. 4, 2008). A "predictive dialer," however, has additional functionalities beyond what the

15   TCPA prescribes. A predictive dialer is "equipment that dials numbers and, when certain computer

16   software is attached, also assists telemarketers in predicting when a sales agent will be available to

17   take calls." 2003 Report and Order, 18 FCC Rcd at 14091 ¶131.

18         Plaintiff does <u>not</u> allege GroupMe sent him messages using a "predictive dialer." Plaintiff

19   alleges only that GroupMe's technology had autodialer functionalities specified in the TCPA, *i.e.*,

20   the "capacity to store or produce telephone numbers to be called, using a random or sequential

21   number generator." Am. Compl., ¶ 55. Plaintiff, to the extent he is inclined, cannot now argue

22   (incorrectly) a new theory, that GroupMe's technology is a predictive dialer. *See generally*

23   *Asociacion de Trabajadores v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010) (a party

24   cannot oppose summary judgment by raising a new theory not pleaded in operative complaint).

25       **1.**    **The FCC Regulations Regarding Predictive Dialers Do Not Apply to**

26           **Text Messages**

27         In any event, the FCC's rulings on predictive dialers do not apply to technologies used to

28   send text messages. The FCC, in defining what constitutes a predictive dialer, has focused solely

16

1    on equipment used in connection with "sales agents" making voice calls to consumers. *See*, *e.g.*,

2    2003 Report and Order at ¶¶ 131-33. Nothing in the FCC's rulings on predictive dialers pertains to

3    text messages, and there is no such thing as a live "sales agent" who is available to speak with

4    consumers when sending a text message.

5         The FCC has further illuminated the scope of its rulings on predictive dialers by

6    explaining the "principal feature of predictive dialing software is a timing function, not number

7    storage or generation." 2003 Report and Order at ¶ 131 (emphasis added). The timing function is

8    crucial because "[a] predictive dialer is an automated dialing system that automatically dials

9    consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer

10   the phone and a telemarketer will be available to take the call." *In re Rules and Regulations*

11   *Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, 25

12   FCC Rcd 1501, 1518 ¶ 44 n.113 (Jan. 22, 2010).

13        The FCC's repeated references in its rulings on predictive dialers to "sales agents" and

14   "timing functions" necessary to predict when a "consumer will answer the phone" belie any attempt

15   to argue the same rules address technologies and functionalities applicable to text messages. *See id.*

16   They do not. *See generally Leyse v. Clear Channel Broadcasting, Inc.*, 545 Fed. Appx. 444, 448-

17   51 (6th Cir. 2013) (courts have authority to determine whether FCC ruling encompasses certain

18   circumstances without violating Hobbs Act).

19              **2.    GroupMe Has Not Used a Predictive Dialer**

20        Without addressing the argument based on the plain language of the FCC's ruling on

21   predictive dialers, *Gragg* held text messaging technologies are not predictive dialers if human

22   intervention is required for the technology to send the text messages. *Gragg*, 2014 WL 494862, at

23   *3-4. *Gragg* held defendants' system required human intervention to send text messages because,

24   before a text message could be sent "the customer must first have provided some amount of

25   information to the dispatcher, the dispatcher must have pressed 'enter' to transmit that information .

26   . ., and the cab driver must have pressed 'accept.'" *Id.* The same is true here.

27        GroupMe cannot, and has never been able to, route or send text messages to group

28   members without a member first triggering such actions. At a minimum, a GroupMe user is

17

1   required to create a group and provide GroupMe with names and cell phone numbers of individuals

2   the group creator wants to add to his or her group before any welcome messages are sent.  Martocci

3   Decl., ¶¶ 9-29; Pignata Decl., ¶ 3.  This is the same type of human intervention found sufficient in

4   *Gragg* -- a text message cannot be sent without several manual inputs by a person and, then, is only

5   sent in direct response to those inputs.

6         The TCPA does not prohibit the use of predictive dialers to send text messages.  To the

7   extent the TCPA does regulate predictive dialers in this context, however, GroupMe and the API

8   Providers' software applications require a sufficient degree of human intervention so as <u>not</u> to

9   qualify as predictive dialers under the TCPA.

10   **V.**     **CONCLUSION**

11         For the foregoing reasons, GroupMe respectfully requests the Court find it did not use an

12   "automatic telephone dialing system" as defined under the TCPA to send Plaintiff text messages,

13   and enter judgment in its favor on Plaintiff's TCPA claim.

14   Dated:  April 28, 2014                   WHITE & CASE LLP

15

16                                   By:   /s/ *Bryan A. Merryman*

17                                        Bryan A. Merryman

18                          Attorneys for Defendant
                         GROUPME, INC.

19

20

21

22

23

24

25

26

27

28

LOSANGELES 1047788 (2K)