BRYAN A. MERRYMAN (SBN 134357)
bmerryman@whitecase.com
J. JONATHAN HAWK (SBN 254350)
jhawk@whitecase.com
WHITE & CASE LLP
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071-2007
Telephone: (213) 620-7700
Facsimile: (213) 452-2329

BIJAL V. VAKIL (SBN 192878)
bvakil@whitecase.com
WHITE & CASE LLP
5 Palo Alto Square, 9th Floor
3000 El Camino Real
Palo Alto, CA 94306
Telephone: (650) 213-0300
Facsimile: (650) 213-8158

Attorneys for Defendant
GROUPME, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| BRIAN GLAUSER, individually and on behalf of a class of similarly situated individuals,<br><br>             Plaintiffs,<br><br>        v.<br><br>TWILIO, INC., a Delaware corporation; and GROUPME, INC., a Delaware corporation,<br><br>             Defendants. | Case No. 4:11-cv-02584-PJH<br><br>**DECLARATION OF J. JONATHAN HAWK IN SUPPORT OF DEFENDANT GROUPME, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: November 5, 2014<br>Time: 9:00 a.m.<br>Courtroom: 3 |

# DECLARATION OF J. JONATHAN HAWK

I, J. Jonathan Hawk, declare:

1.    I am an associate in the law firm of White & Case LLP, attorneys of record for defendant GroupMe, Inc. ("GroupMe") in this action. I have personal knowledge of the facts set forth herein, and could testify competently thereto if called upon to do so.

2.    On May 12, 2014, GroupMe served on plaintiff Brian Glauser ("Plaintiff"), among other written discovery requests, GroupMe's first request for admissions. On June 20, 2014, after obtaining two extensions of time to serve responses, Plaintiff served his responses to all of GroupMe's written discovery requests, including to GroupMe's first request for admissions.

3.    Plaintiff answered GroupMe's request for admission no. 5 as follows:

> **REQUEST FOR ADMISSION NO. 5:** Admit GroupMe, Inc. never contacted you using an artificial or prerecorded voice.
>
> **ANSWER:** Plaintiff admits this Request.

A true and correct copy of Plaintiff's answer to GroupMe's request for admission no. 5 is attached as Exhibit D.

4.    On October 9, 2014, I conducted the deposition of Shawn C. Davis. Attached as Exhibit E is a true and correct copy of pages 76-77, 82-83, 93-95, 111-115, 125, 153-154, 163-164, 229-231, 236-237, 244-246, 250, 256-257, 266-267, and 276-277 of the transcript of his deposition, which pages GroupMe has de-designated so as to have no confidentiality designation. The attached pages from the transcript accurately reflect the questions asked and the answers given by Mr. Davis at his deposition. At his deposition, Mr. Davis testified:

a.    Mr. Davis is a full-time employee of Edelson PC (76:12-77:12);

b.    Mr. Davis spends 90% of his time working for the Edelson firm as part of an in-house technology group that tests applications and software looking for privacy and data breaches. Mr. Davis is the head of the technical aspect of that group, and performs his work for the Edelson firm often before the Edelson firm files a lawsuit (82:14-83:10, 93:25-94:24, 95:15-22);

c.    Mr. Davis considers his work in connection with this case to be part of his

1

| | | |
|---|---|---|
| 1 | | normal work for the Edelson firm (153:23-154:9); |
| 2 | d. | Prior to this lawsuit, Mr. Davis had no experience with the programming |
| 3 | | language Ruby, and no experience with the web programming framework |
| 4 | | Ruby on Rails (125:18-25); |
| 5 | e. | Before forming his opinions, Mr. Davis did not review GroupMe's |
| 6 | | summary judgment motion or the declarations of Steve Martocci, John |
| 7 | | Pignata, and Ameer Badri filed in support thereof (276:4-19); |
| 8 | f. | Mr. Davis acknowledges a GroupMe user provides GroupMe with a new |
| 9 | | user's phone number and name, and requests GroupMe add the new user to |
| 10 | | a GroupMe group, causing GroupMe to create a new user and send the new |
| 11 | | user a text message that welcomes him or her to the group (229:17-231:15, |
| 12 | | 236:14-20); |
| 13 | g. | Mr. Davis <u>has no basis to dispute</u>: |
| 14 | | i. A GroupMe user must create a group before GroupMe can assign a |
| 15 | | ten-digit number to that group (250:16-20); |
| 16 | | ii. A GroupMe user must provide GroupMe with a new member's |
| 17 | | name and phone number, and request GroupMe add the new |
| 18 | | member to the group, in order for GroupMe to send the new |
| 19 | | member a "welcome" message (229:17-231:15, 236:14-20, 245:5- |
| 20 | | 246:5); |
| 21 | | iii. GroupMe populates the "welcome" message sent to a new |
| 22 | | GroupMe member with information provided by another user |
| 23 | | (236:14-237:25); |
| 24 | | iv. Text messages cannot be sent using GroupMe and Twilio unless a |
| 25 | | GroupMe user takes some action (244:16-20, 245:5-246:7, 256:24- |
| 26 | | 257:11, 266:18-267:2); |
| 27 | | v. The "welcome" message sent to Plaintiff was not entirely pre- |
| 28 | | programmed, as it identified Plaintiff's name, the names of two |

2

1    other individuals, and the name of the group, "Poker" (236:14-

2        237:25);

3    h.  Mr. Davis bases his belief that GroupMe and Twilio automatically dial phone

4        numbers only on his analysis of GroupMe and Twilio's "back-end" processes of

5        handling delivery and receipt of messages <u>after</u> a GroupMe user takes some

6        specified action (163:16-164:21, 276:22-277:20); and

7    i.  Mr. Davis believes sending an SMS message from a smartphone without using

8        GroupMe is an "automated" process, performed "without human intervention," as

9        long as he focuses solely on what happens <u>after</u> a user presses "send" on his or her

10       smartphone (111:23-115:18).

11   I declare under penalty of perjury under the laws of the United States of America the

12   foregoing is true and correct.

13       Executed this 20th day of October, 2014, at Los Angeles, California.

14                                        _/s/ J. Jonathan Hawk___
15                                          J. Jonathan Hawk

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

Mark S. Eisen (SBN- 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin H. Richman (Admitted *Pro Hac Vice*)
brichman@edelson.com
Christopher L. Dore (Admitted *Pro Hac Vice*)
cdore@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff and the Putative Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN GLAUSER, individually and on behalf of all others similarly situated,<br><br>   *Plaintiff,*<br><br>*v.*<br><br>GROUPME, INC., a Delaware corporation,<br><br>   *Defendant.* | Case No.: 4:11-cv-02584-PJH<br><br>**PLAINTIFF GLAUSER'S ANSWERS TO DEFENDANT GROUPME, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS** |

Plaintiff Brian Glauser ("Glauser" or "Plaintiff"), by and through his undersigned counsel, for his answers to Defendant GroupMe, Inc.'s ("GroupMe" or "Defendant") First Set of Requests for Admissions, states as follows. All answers contained herein are based only upon such information and documents presently available to Plaintiff. Further discovery, investigation, research and analysis may supply additional facts and/or add meaning to known facts. Moreover, the answers below are given without prejudice to Plaintiff's right to later produce and/or supplement these answers with additional information.

**REQUEST FOR ADMISSION NO. 1:**

Admit you gave GroupMe, Inc. prior express consent to send you text messages when you registered to use GroupMe, Inc.'s group messaging service.

**ANSWER:** Plaintiff denies this Request.

*   *   *

**REQUEST FOR ADMISSION NO 2:**

Admit you have never revoked the prior express consent you gave GroupMe, Inc. to send you text messages after you registered to use GroupMe's group messaging service.

**ANSWER:** Plaintiff objects to this Request on the basis that it assumes Plaintiff provided prior express consent to receive text messages from Defendant GroupMe. Subject to and without waiving this objection, Plaintiff states that he did not provide any prior express and therefore, that he could not revoke any purported consent.

*   *   *

**REQUEST FOR ADMISSION NO. 3:**

Admit you never requested to be removed from or to stop receiving text messages as part of any group using GroupMe, Inc.'s group messaging service.

**ANSWER:** Plaintiff admits this Request.

*   *   *

**REQUEST FOR ADMISSION NO. 4:**

Admit you never received any text massages from GroupMe, Inc. for the purpose of telemarketing.

**ANSWER:** Plaintiff denies this Request.

*          *          *

**REQUEST FOR ADMISSION NO. 5:**

Admit GroupMe, Inc. never contacted you using an artificial or prerecorded voice.

**ANSWER:** Plaintiff admits this Request.

*          *          *

**REQUEST FOR ADMISSION NO. 6:**

Admit GroupMe, Inc. can only transmit a text message to a user of its group messaging service in response to an action by another user of GroupMe, Inc.'s group messaging service.

**ANSWER:** Plaintiff objects to this Request on the basis that the phrase "in response to an action by another user" is vague and ambiguous. Subject to and without waiving this objection, after reasonable inquiry, Plaintiff does not have sufficient knowledge or information within his possession, custody or control, to admit or deny this Request.

*          *          *

**REQUEST FOR ADMISSION NO. 7:**

Admit you know of no method to determine whether a putative class member gave prior express consent to receive text messages on his or her cellular telephone as part of a group messaging conversation using GroupMe, Inc.'s group messaging service other than ask each putative class member whether he or she gave prior express consent to receive such text messages.

**ANSWER:** Plaintiff denies this Request.

*          *          *

**REQUEST FOR ADMISSION NO. 8:**

Admit you cannot identify members of your proposed classes without asking each putative class member whether he or she gave prior express consent to receive text messages as part of GroupMe, Inc.'s group messaging service.

**ANSWER:** Plaintiff denies this Request.

2    **BRIAN GLAUSER**, individually and on behalf of all
3    others similarly situated,

4    Dated:  June 20, 2014          By:  /s/ Benjamin H. Richman
                                         One of Plaintiff's Attorneys
5

6    Jay Edelson (Admitted *Pro Hac Vice*)
     jedelson@edelson.com
7    Rafey S. Balabanian (Admitted *Pro Hac Vice*)
     rbalabanian@edelson.com
8    Benjamin H. Richman (Admitted *Pro Hac Vice*)
     brichman@edelson.com
9    Christopher L. Dore (Admitted *Pro Hac Vice*)
     cdore@edelson.com
10   EDELSON PC
     350 North LaSalle Street, Suite 1300
11   Chicago, Illinois 60654
     Tel: 312.589.6370
12   Fax: 312.589.6378

13   Mark S. Eisen (SBN- 289009)
     meisen@edelson.com
14   EDELSON PC
     555 West Fifth Street, 31st Floor
15   Los Angeles, California 90013
     Tel: 213.533.4100

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Courtney C. Booth, an attorney, hereby certify that on June 20, 2014, I served the above and foregoing ***Plaintiff Glauser's Answers to Defendant GroupMe, Inc.'s First Set of Requests for Admissions*** by causing true and accurate copies of such paper to be transmitted via electronic mail to the persons shown below and further, by causing true and accurate copies of such paper to placed in postage prepaid envelopes addressed to the persons shown below and by causing such envelopes to be deposited in the United States Mailbox located at 350 North LaSalle Street, Chicago, Illinois on this the 20th day of June, 2014:

Bryan A. Merryman
J. Jonathan Hawk
WHITE & CASE LLP
633 W. Fifth Street, Suite 1900
Los Angeles, California 90071-2007
bmerryman@whitecase.com
jhawk@whitecase.com

/s/ Courtney C. Booth

# EXHIBIT E

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    OAKLAND DIVISION

4    BRIAN GLAUSER, individually      )

5    and on behalf of all others      )

6    similarly situated,              )

7                   Plaintiff,        )

8             vs.                     )    4:11-cv-02584-PJH

9    GROUPME, INC., a Delaware        )

10   corporation,                     )

11                   Defendant.       )

12

13        The deposition of SHAWN DAVIS, called for

14   examination, taken pursuant to the Federal Rules of

15   Civil Procedure of the United States District Courts

16   pertaining to the taking of depositions, taken before

17   Lynn A. McCauley, CSR No. 84-003268, RPR, a Certified

18   Shorthand Reporter of the State of Illinois, at

19   350 North LaSalle Street, Suite 1300, Chicago,

20   Illinois, on October 9, 2014, at 9:37 a.m.

21

22

23

24

25

                                            Page 1

```
 1   PRESENT:
 2        EDELSON PC, by
          MR. BENJAMIN H. RICHMAN AND
 3        MS. COURTNEY BOOTH
          350 North LaSalle Street, Suite 1300
 4        Chicago, Illinois 60654
          312-589-6370
 5        brichman@edelson.com
          cbooth@edelson.com
 6             Appeared on behalf of Plaintiff;
 7
               and
 8
 9        WHITE & CASE LLP, by
          MR. J. JONATHAN HAWK
10        633 West 5th Street, Suite 1900
          Los Angeles, California 90071-2087
11        213-620-7802
          jhawk@whitecase.com
12             Appeared on behalf of Defendant.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| | | |
|---|---|---|
| 1 | A.    No. | 10:48 |
| 2 | Q.    Did you rely on anything you learned in | 10:48 |
| 3 | taking any of the courses you needed to sit for | 10:48 |
| 4 | certification exams? | 10:49 |
| 5 | A.    Not that I can recall. | 10:49 |
| 6 | MR. RICHMAN:  Could we maybe take a | 10:49 |
| 7 | five-minute break? | 10:49 |
| 8 | MR. HAWK:  Sure. | 10:49 |
| 9 | (WHEREUPON, a recess was | 10:49 |
| 10 | had.) | 10:49 |
| 11 | BY MR. HAWK: | 11:00 |
| 12 | Q.    Mr. Davis, where are you currently | 11:00 |
| 13 | employed? | 11:00 |
| 14 | A.    The Edelson firm. | 11:00 |
| 15 | Q.    Do you have a title at the Edelson firm? | 11:00 |
| 16 | A.    I am director of digital forensics.  I'm | 11:00 |
| 17 | also employed at the Illinois Institute of | 11:00 |
| 18 | Technology. | 11:00 |
| 19 | Q.    Simultaneously; correct? | 11:00 |
| 20 | A.    Correct. | 11:00 |
| 21 | Q.    And is the Edelson firm representing you | 11:00 |
| 22 | here today as your attorney? | 11:00 |
| 23 | A.    That's correct. | 11:00 |
| 24 | Q.    Okay.  How long have you been the | 11:00 |
| 25 | director of digital forensics for the Edelson firm? | 11:00 |

Page 76

| | | |
|---|---|---|
| 1 | A.   Since August. | 11:00 |
| 2 | Q.   August of which year? | 11:00 |
| 3 | A.   August of this year. | 11:01 |
| 4 | Q.   2014; right? | 11:01 |
| 5 | A.   That is correct. | 11:01 |
| 6 | Q.   So less than three months? | 11:01 |
| 7 | A.   That's correct.  Actually -- I was | 11:01 |
| 8 | looking at my own resume. | 11:01 |
| 9 |       When I started at Edelson, it was in | 11:01 |
| 10 | August of 2013, but, yes, when I ended up being the | 11:01 |
| 11 | director, it's been for a few months.  I can't | 11:01 |
| 12 | remember what exact month it was. | 11:01 |
| 13 | Q.   Okay.  And what are your duties and | 11:01 |
| 14 | responsibilities as director of digital forensics at | 11:01 |
| 15 | the Edelson firm? | 11:01 |
| 16 | A.   Basically, assisting attorneys when their | 11:01 |
| 17 | technical needs might exceed their knowledge. | 11:01 |
| 18 | Q.   What kind of technical needs do you help | 11:01 |
| 19 | them with? | 11:01 |
| 20 | A.   Various things.  For example, one could | 11:01 |
| 21 | be the database matching I had to do on the | 11:02 |
| 22 | Kristensen case.  It could be source code reviews, | 11:02 |
| 23 | things like that. | 11:02 |
| 24 | Q.   Anything else? | 11:02 |
| 25 | A.   Not offhand.  Reviewing software. | 11:02 |

Page 77

1       Q.   Okay.  What duties do you have now that        11:06
2   you did not have in your previous role?                 11:06
3       A.   No specific different duties that I can        11:06
4   think of.  As I say, just a little more involved.  I    11:06
5   probably spend more time on my duties than I did        11:06
6   before.                                                 11:06
7       Q.   Okay.  But you can't think of any              11:06
8   specifics that you do now that you did not do           11:06
9   previously?                                             11:06
10      A.   I cannot think of any, no.                     11:06
11      Q.   Okay.  Are there any other computer            11:06
12  forensic investigators at the Edelson firm?            11:06
13      A.   Not currently, no.                             11:06
14      Q.   Does the Edelson firm have an in-house         11:06
15  tech lab of people who test applications and           11:06
16  software, looking for privacy and data breaches?       11:06
17      A.   They do.                                       11:06
18      Q.   How many people are in that department?       11:06
19      A.   Within that group, it might be five to        11:06
20  eight people.                                           11:07
21      Q.   Do those people all have the same title?      11:07
22      A.   I'm not sure.                                  11:07
23      Q.   Do you know the titles of anybody in that     11:07
24  group?                                                  11:07
25      A.   Not offhand.                                   11:07

                                             Page 82

| | | | |
|---|---|---|---|
| 1 | Q. | Are you in that group? | 11:07 |
| 2 | A. | I am in that group. | 11:07 |
| 3 | Q. | Currently? | 11:07 |
| 4 | A. | Currently. | 11:07 |
| 5 | Q. | Okay.  And were you in that group before | 11:07 |
| 6 | you were promoted to director of digital forensics? | | 11:07 |
| 7 | A. | I was. | 11:07 |
| 8 | Q. | So you've been in that group since August | 11:07 |
| 9 | of 2013; correct? | | 11:07 |
| 10 | A. | That's correct. | 11:07 |
| 11 | Q. | And what have you done as part of that | 11:07 |
| 12 | group? | | 11:07 |
| 13 | A. | Basically, worked on what I had mentioned | 11:07 |
| 14 | in the earlier question. | | 11:07 |
| 15 | Q. | Okay.  Any specific projects you can | 11:07 |
| 16 | remember? | | 11:07 |
| 17 | A. | Not that I can -- | 11:07 |
| 18 | MR. RICHMAN:  Objection to the extent it | | 11:07 |
| 19 | calls for work product. | | 11:07 |
| 20 | I'm not really sure what you're | | 11:07 |
| 21 | asking.  If you're asking him what other cases or | | 11:08 |
| 22 | investigations he's worked on for cases, then we | | 11:08 |
| 23 | can't go into that, because that's work product. | | 11:08 |
| 24 | The types of things he worked on, he | | 11:08 |
| 25 | just answered. | | 11:08 |

Page 83

1   source code while at the Edelson firm?                11:17

2        A.   Define purpose.                             11:17

3        Q.   Why have you done it?                       11:17

4        A.   I've been asked to.                         11:17

5        Q.   Okay.  Have you been asked to look for      11:17

6   anything in particular, without getting into the     11:17

7   specific software, because your counsel will not let 11:17

8   you answer that?                                      11:17

9        A.   Not that I can think of in specifics.       11:17

10       Q.   Okay.  As you sit here, you don't           11:17

11  remember?                                             11:17

12       A.   Correct.                                    11:17

13       Q.   You said you also have spent time           11:17

14  analyzing functions in code?                          11:17

15       A.   I have.                                     11:17

16       Q.   What portion of your time, while here at    11:17

17  the Edelson firm, would you say you have spent doing  11:17

18  that?                                                 11:17

19       A.   I wouldn't really be able to say as a       11:17

20  percentage.                                           11:17

21       Q.   Okay.  Less than 50?                        11:17

22       A.   Hard to say.                                11:17

23       Q.   You have no idea?                           11:17

24       A.   I have no idea.                             11:17

25       Q.   Has all of your work while here at the      11:17

1  Edelson firm been performed as part of this group     11:17

2  we've been discussing that examines applications in    11:18

3  technology for privacy and data breaches?              11:18

4       A.   For the most part.                           11:18

5       Q.   What percentage of your work would you       11:18

6  say is performed as part of that group?                11:18

7       A.   I would say probably 90 percent.             11:18

8       Q.   What is the other 10 percent spent doing?    11:18

9       A.   Dealing with technology issues around the    11:18

10 office, Wi-Fi goes down, stuff like that.              11:18

11      Q.   Are you the head of this group?              11:18

12      A.   Not of the entire group, no.                 11:18

13      Q.   Are you head of part of a group -- part      11:18

14 of the group?                                          11:18

15      A.   I would suppose the technical end of it.     11:18

16      Q.   Let me put it a different way.               11:18

17           Do you have direct reports?                  11:18

18      A.   Do I what?                                   11:18

19      Q.   Have direct reports?                         11:18

20      A.   I do not.                                    11:18

21      Q.   Okay.  And why would you say you were the    11:18

22 head of the technical end of it?                       11:18

23      A.   I'm in charge of the technical              11:18

24 investigation part.                                    11:18

25      Q.   Does anybody besides you perform the         11:18

1   technical investigations?                       11:18

2        A.   At times.                             11:18

3        Q.   Are there any other full-time employees    11:18

4   in that group that perform technical investigations?  11:19

5        A.   You'd have to define technical         11:19

6   investigations, but yes.                        11:19

7        Q.   How would you define it?              11:19

8        A.   I would define a technical investigation   11:19

9   as, basically, again, looking at technology, seeing   11:19

10  how it functions, be it software, Website, things    11:19

11  like that.                                      11:19

12       Q.   Now, are you looking into these        11:19

13  technologies before cases are filed?            11:19

14       A.   Can you repeat the question?          11:19

15       Q.   Are you looking into these technologies   11:19

16  before cases are filed, as part of your work in this   11:19

17  group?                                          11:19

18       A.   At times.                             11:19

19       Q.   How often would you say you're looking at   11:19

20  these technologies before a case is filed as opposed   11:19

21  to looking at them after?                       11:19

22       A.   Maybe 30 percent of the time.         11:19

23       Q.   And the other 70 percent is after a case   11:19

24  has been filed?                                 11:19

25       A.   That's correct.                       11:19

Page 95

1     A.   I did not.                              11:34

2     Q.   And did you have any experience while at     11:34

3  B2B in systems transmitting SMS?                    11:34

4     A.   I did not.                              11:34

5     Q.   So aside from the experiences you've told    11:35

6  me about at the Edelson Firm and at Motorola, in    11:35

7  forming your opinions in this case, have you relied  11:35

8  on any other experiences while at ChicagoMicro or B2B  11:35

9  in forming your opinions here?                     11:35

10     A.   No.                                    11:35

11     Q.   And you were employed at places before     11:35

12  B2B; correct?                                   11:35

13     A.   That's correct.                        11:35

14     Q.   And did any of those jobs involve writing   11:35

15  programming code?                               11:35

16     A.   Not that I can recall.                  11:35

17     Q.   Did any of those jobs before B2B that you   11:35

18  had involve reading programming code?              11:35

19     A.   Not that I can recall.                  11:35

20     Q.   Did any of those jobs that you had before   11:35

21  B2B involve Web design?                         11:35

22     A.   No.                                    11:35

23     Q.   Did any of the jobs that you before B2B     11:35

24  involve working with systems that exchange SMS?     11:35

25     A.   Somewhat.                              11:35

Page 111

1        Q.    How?                                    11:36

2        A.    I worked for US Cellular, and then I also    11:36

3    worked for Verizon Agent.  So I had received some    11:36

4    training on how cellular networks work and how SMS    11:36

5    works.  I had a training course through US Cellular    11:36

6    corporate in Madison, Wisconsin.               11:36

7        Q.    Can you describe from your training on    11:36

8    how SMS works?                                  11:36

9        A.    Can you expand on that?               11:36

10       Q.    Sure.                                 11:36

11             From that training, what is your       11:36

12    understanding as to how SMS works?            11:36

13       A.    So, in general, you're using a client    11:36

14    device that's going to end up contacting a cell tower    11:36

15    and go through various routing.  And then,     11:36

16    ultimately, a text message is going to be delivered,    11:36

17    you know, to another client device, in a nutshell.    11:36

18       Q.    Okay.  What is your understanding as to    11:36

19    how that routing is performed?                 11:36

20       A.    It's usually routed either within -- I    11:36

21    mean, there's some routing that occurs within the    11:36

22    cell tower itself.  And then it gets back to the    11:37

23    corporate headquarters or wherever they have their    11:37

24    servers, and then it would be sent out.        11:37

25       Q.    So is the process you're describing the    11:37

```
 1   process that occurs after somebody hits send on a        11:37
 2   text message on their phone?                             11:37
 3        A.   That's correct.                                11:37
 4        Q.   So it's the process that occurs on that        11:37
 5   person's phone across the wireless network in the        11:37
 6   cell tower all the way through delivery to where it's    11:37
 7   going?                                                   11:37
 8        A.   That's correct.                                11:37
 9        Q.   Would you say that process happens             11:37
10   without human intervention?                             11:37
11        A.   I would say --                                 11:37
12        MR. RICHMAN:  I just want to lodge one              11:37
13   objection to the extent you're asking for a legal        11:37
14   conclusion, but you can go ahead and answer.             11:37
15   BY THE WITNESS:                                          11:37
16        A.   Okay.  I would say part of the process         11:37
17   does.  Sure.                                             11:37
18   BY MR. HAWK:                                             11:37
19        Q.   Which part of the process?                     11:37
20        A.   After send, everything after that is           11:37
21   automated without human intervention.                   11:37
22        Q.   So say I'm sending a text message from my      11:38
23   smart phone.  I hit send.                                11:38
24             You're saying that your                        11:38
25   understanding of SMS is that everything that happens     11:38
```

                                           Page 113

1   after that point through the time of delivery happens      11:38

2   without human intervention --      11:38

3          A.   That's correct.      11:38

4          Q.   -- and is automated?      11:38

5          A.   Correct.      11:38

6          Q.   Does your understanding change if I      11:38

7   include my hitting the send button?  Is it still done      11:38

8   without human intervention?      11:38

9          A.   I would say you had to hit the send      11:38

10  button to have the content of the message be put into      11:38

11  the chain, but as I mentioned, once you hit send,      11:38

12  then, yes, there's no human intervention after that      11:38

13  point.      11:38

14         Q.   But causing the message to enter that      11:38

15  chain, that process you described, constitutes human      11:38

16  intervention; correct?      11:38

17         A.   Yeah.  A human would have to type that      11:38

18  in, yes.  That's correct.      11:38

19         Q.   That's yes; right?      11:38

20         A.   Yes.      11:38

21         Q.   So from pressing send and including      11:38

22  pressing send, all the way through delivery of a text      11:39

23  message, the entire process is not done without human      11:39

24  intervention; correct?      11:39

25         A.   It depends what you define the process      11:39

Page 114

| | | |
|---|---|---|
| 1 | is. | 11:39 |
| 2 | Q.   The process you've just described. | 11:39 |
| 3 | A.   So I would stand by my original answer | 11:39 |
| 4 | of, the person would put the content of the message, | 11:39 |
| 5 | and then they would have to inject that into the | 11:39 |
| 6 | chain.  And then at that point it's all going to be | 11:39 |
| 7 | without human intervention. | 11:39 |
| 8 | Q.   But if you include that pressing the | 11:39 |
| 9 | send, you cannot say the entire process is done | 11:39 |
| 10 | without human intervention; right? | 11:39 |
| 11 | A.   I'm more referring to the process after | 11:39 |
| 12 | that point. | 11:39 |
| 13 | Q.   Right.  I'm asking you to assume you | 11:39 |
| 14 | include that as part of the process.  You include it | 11:39 |
| 15 | as part of the process, the person hitting send. | 11:39 |
| 16 | A.   If I was going to include that in there, | 11:39 |
| 17 | then, yes, it would require human intervention for | 11:39 |
| 18 | that part. | 11:39 |
| 19 | Q.   So I also understand you teach at IIT; | 11:40 |
| 20 | right? | 11:40 |
| 21 | A.   That's correct. | 11:40 |
| 22 | Q.   How long have you taught there? | 11:40 |
| 23 | A.   Since spring semester, last spring | 11:40 |
| 24 | semester.  So this is my second semester teaching | 11:40 |
| 25 | there. | 11:40 |

Page 115

| | | |
|---|---|---|
| 1 | Q.   You're referring to Ruby on Rails? | 11:49 |
| 2 | A.   That's correct. | 11:49 |
| 3 | Q.   How would you define a Web programming | 11:49 |
| 4 | framework? | 11:49 |
| 5 | A.   Basically -- so if you have Ruby, is the | 11:49 |
| 6 | actual language, if I'm using the Ruby on Rails | 11:49 |
| 7 | example, Rails is, basically, the framework that you | 11:49 |
| 8 | can add to Ruby.  You can download what's called a | 11:49 |
| 9 | Gem, which is, basically, a package. | 11:49 |
| 10 | So then you end up setting that up, | 11:49 |
| 11 | and that basically lets Ruby be integrated in with | 11:49 |
| 12 | the Web server so that it can receive and process | 11:49 |
| 13 | various requests. | 11:49 |
| 14 | Q.   Do you have any experience using Ruby on | 11:49 |
| 15 | Rails? | 11:49 |
| 16 | A.   I tinkered around with a little bit just | 11:49 |
| 17 | for this case, but not prior. | 11:49 |
| 18 | Q.   So prior to this case, you had no | 11:49 |
| 19 | experience with Ruby on Rails? | 11:49 |
| 20 | A.   That's correct. | 11:49 |
| 21 | Q.   Prior to this case, have you had any | 11:49 |
| 22 | experience with Ruby? | 11:50 |
| 23 | A.   I have not. | 11:50 |
| 24 | Q.   You have not? | 11:50 |
| 25 | A.   That's correct. | 11:50 |

Page 125

1        Q.    Approximately 10 hours; is that fair?        12:43

2        A.    Yeah.        12:43

3        Q.    And then the balance of the time, you        12:43

4    spent reviewing the rest of the documents GroupMe        12:43

5    produced, excluding source code?        12:43

6        A.    That's correct.        12:43

7        Q.    And you spent no time, as part of forming        12:43

8    your opinions in this case, reviewing plaintiff's        12:43

9    motion for class certification?        12:43

10        A.    That's correct.        12:44

11        Q.    Do you have an hourly rate you're paid in        12:44

12    connection with your work on this case?        12:44

13        A.    I do not.        12:44

14        Q.    You're salaried?        12:44

15        A.    That is correct.        12:44

16        Q.    That's the 90,000 a year we discussed        12:44

17    earlier; right?        12:44

18        A.    Yes.        12:44

19        Q.    So are you paid at all for your work in        12:44

20    connection with this case?        12:44

21        A.    Not outside of my just normal salary from        12:44

22    working on any case.        12:44

23        Q.    Do you consider the work you're doing on        12:44

24    this case in addition to your normal work at the        12:44

25    Edelson firm?        12:44

Page 153

| | | | |
|---|---|---|---|
| 1 | A. | I do not. | 12:44 |
| 2 | Q. | You consider it part of your work -- | 12:44 |
| 3 | A. | That's correct. | 12:44 |
| 4 | Q. | -- for the Edelson firm? | 12:44 |
| 5 | A. | Yes. | 12:44 |
| 6 | Q. | And that's part of your salary -- | 12:44 |
| 7 | A. | Yes. | 12:44 |
| 8 | Q. | -- is your compensation? | 12:44 |
| 9 | A. | Yes. | 12:44 |

10      Q.   You testified earlier that nobody has      12:44

11  helped you in forming your opinions; correct?      12:44

12      A.   That's correct.      12:44

13      Q.   Has anybody assisted you in performing      12:44

14  the work that went into forming your opinions?      12:44

15      A.   They have not.      12:44

16      Q.   Did you discuss this deposition before      12:45

17  today with anybody?      12:45

18      A.   Ben Richman, Courtney Booth, Chandler      12:45

19  Givens.      12:45

20      Q.   Anybody else?      12:45

21      A.   Not that I can think of, no.      12:45

22      Q.   I'm not asking about the content of your      12:45

23  conversations with your lawyers, but did you meet      12:45

24  with them before today to discuss this deposition?      12:45

25      A.   I did.      12:45

1    A.    I do.                                          12:53

2    Q.    What is that?                                  12:53

3    A.    So it's a text messaging service that can      12:53

4 be utilized through an API for other organizations to   12:53

5 use.                                                     12:53

6    Q.    What is that based on?                         12:53

7    A.    Based off of reading the documentation.        12:53

8    Q.    Any other bases for your understanding of      12:53

9 what Twilio is?                                          12:53

10   A.    Not that I can think of.                        12:53

11   Q.    Okay.  So based on your understanding of        12:53

12 GroupMe and Twilio, can you describe the series of       12:53

13 events that you believe occurs, starting with the        12:53

14 time that somebody creates a group using GroupMe?        12:53

15   A.    Can you say that one more time?                 12:53

16   Q.    Sure.                                           12:53

17         Based on your understanding of                 12:53

18 GroupMe and Twilio, can you describe the series of       12:53

19 events that starts when somebody creates a group         12:53

20 using GroupMe?                                           12:53

21   A.    Yeah.  I can explain that.                      12:53

22   Q.    Please.                                         12:53

23   A.    Okay.  Well, there's various steps.  So        12:53

24 one is a group would have to be created.  And I might    12:53

25 not have these, you know, in the exact order.  I'd       12:54

1    have to reference my declaration, but a group is         12:54

2    essentially created.  There are group members that        12:54

3    are added to that group.                                  12:54

4              Automatically, the group is assigned            12:54

5    a telephone number that serves the basis for being        12:54

6    able to send messages back and forth.  So it has          12:54

7    that.                                                     12:54

8              So all of that is basically                     12:54

9    occurring on the back-end GroupMe servers.  When the      12:54

10   text messaging actually occurs, the GroupMe              12:54

11   infrastructure uses the API to communicate with          12:54

12   Twilio.                                                   12:54

13             And Twilio serves as the actual SMS            12:54

14   provider, basically, for GroupMe, and they handle the    12:54

15   actual delivery and receipt of messages.                 12:54

16        Q.   And are your opinions in your declaration      12:54

17   all limited to that back-end process?                    12:54

18        A.   Say it one more time.                          12:54

19        Q.   Are the opinions in your declaration           12:54

20   limited to what happens in that back-end process?        12:54

21        A.   That's correct.                                12:54

22        Q.   When you created a GroupMe group, did you      12:54

23   receive any administrative text messages?               12:55

24        A.   I --                                           12:55

25        MR. RICHMAN:  Objection.  Administrative is         12:55

1   message automatically without human intervention.        02:19

2        Q.   Whose server?                                  02:19

3        A.   That would be -- so once GroupMe's server      02:19

4   pulled the preprogrammed text message, it would send     02:19

5   it automatically to Twilio, which then would deliver     02:19

6   it.                                                      02:19

7        Q.   And you use human intervention -- without      02:19

8   human intervention throughout this declaration;         02:19

9   right?

10       A.   Correct.                                       02:19

11       Q.   Okay.  Does that have one meaning              02:19

12  throughout the declaration?                              02:19

13       A.   It does.                                       02:19

14       Q.   So everywhere it appears, it has the same      02:19

15  meaning?                                                 02:19

16       A.   Yes.                                           02:19

17       Q.   And what is that meaning you assign to         02:19

18  the term "without human intervention"?                  02:20

19       A.   That would basically mean sent in an          02:20

20  automated fashion, where a user didn't have to          02:20

21  actually cause it to happen.                            02:20

22            So the user didn't type the                   02:20

23  preprogrammed -- the user didn't type the message and   02:20

24  then the server sent it.                                02:20

25            It was already stored.  And then              02:20

Page 229

1   without a human having to do anything, the server        02:20

2   grabbed that message and then sent it.                   02:20

3        Q.   So without -- I just want to make sure         02:20

4   we're on the same page.                                  02:20

5             Without human intervention to you              02:20

6   means that the user had to do absolutely nothing in      02:20

7   order for that message to be sent out?                   02:20

8        A.   Well, I mean, as you said, there's always      02:20

9   going to be a start, where a user has to do              02:20

10  something.  I mean, the user would have to add the        02:20

11  person to the group.  Someone technically had to turn     02:20

12  on the server.                                            02:20

13            So it always -- there's always going           02:20

14  to be some element of human in everything.  Someone      02:20

15  is going to have to turn it on.                           02:20

16            You know, they're going to have to             02:20

17  provision the server and create everything, but once     02:20

18  everything is set up, then, yes, certain aspects of       02:20

19  this are fully automated and don't require any human     02:20

20  intervention.                                             02:21

21       Q.   Do you understand what triggers this           02:21

22  introductory text message to be sent out?                02:21

23       A.   Yeah.  That's kind of covered in the next      02:21

24  section.                                                  02:21

25       Q.   Okay.  Do you understand that it involves      02:21

| | | |
|---|---|---|
| 1 | any user action? | 02:21 |
| 2 | A.    Not from the point where there's the | 02:21 |
| 3 | preprogrammed message and it's sent, no, I don't | 02:21 |
| 4 | think it takes any user action. | 02:21 |
| 5 | Q.    Before that point, do you have an | 02:21 |
| 6 | understanding as to whether there's user action? | 02:21 |
| 7 | A.    Not aside from the actual -- as we've | 02:21 |
| 8 | mentioned several times, ultimately, the phone number | 02:21 |
| 9 | would have to be entered into the system to start. | 02:21 |
| 10 | So I acknowledge that.  You would | 02:21 |
| 11 | have to put that in.  From then on, that's where it's | 02:21 |
| 12 | all fully automated. | 02:21 |
| 13 | Q.    So a user has to put in the phone number | 02:21 |
| 14 | in order for this process to start? | 02:21 |
| 15 | A.    That's correct. | 02:21 |
| 16 | Q.    Okay.  So after your review of what is | 02:21 |
| 17 | Exhibit C, what did you do to determine this Opinion | 02:21 |
| 18 | No. 2? | 02:22 |
| 19 | A.    So then I looked at Exhibit B.  This, we | 02:22 |
| 20 | already covered.  And I noticed that there were | 02:22 |
| 21 | similarities between the preprogrammed intro text and | 02:22 |
| 22 | this message, such as a group name. | 02:22 |
| 23 | It shows the group that's in quote. | 02:22 |
| 24 | It shows a member of the group, which is very similar | 02:22 |
| 25 | to the "you've been added to group name," which it | 02:22 |

1    Q.   Okay.  And if you're limiting it to the    02:27

2    documents you've received and the opinions reached    02:27

3    and somebody else in this case has an opinion as to    02:27

4    that, you would have no basis to dispute it; right?    02:27

5    MR. RICHMAN:  Objection.  It calls for    02:27

6    speculation.    02:27

7    You can answer, Shawn, but you're    02:27

8    not saying what the opinion is.  So how can he    02:27

9    respond to that?    02:27

10    You can go ahead and answer.    02:27

11    BY THE WITNESS:    02:27

12    A.   I wasn't sure what the opinion was.

13    BY MR. HAWK:    02:27

14    Q.   Okay.  If somebody says that a user has    02:27

15    to put this information in before it will show up in    02:27

16    these variables -- so the user has to provide GroupMe    02:27

17    with the group name, and the user has to provide the    02:27

18    names of Friend 1, Friend 2, Friend 3 -- would you    02:27

19    have any basis to dispute that?    02:27

20    A.   Not that I know of, no.    02:27

21    Q.   If that were to be the case, if a user    02:27

22    had to provide those variables to populate these    02:27

23    fields, would this still constitute a preprogrammed    02:27

24    message, as far as you're concerned?    02:27

25    A.   Yeah.    02:27

1      Q.   Why?                                    02:27

2      A.   Because the content of the message is   02:27

3  still preprogrammed, even if it's pulling in     02:27

4  information to cover a variable.                  02:28

5           You know, as you can see, there's       02:28

6  however many words, 20 words.  So that's three words  02:28

7  out of the text message.                          02:28

8           It doesn't dispute the fact that the    02:28

9  rest of the text message is still preprogrammed.  02:28

10     Q.   So if we can look at Exhibit B then on  02:28

11 Page 8 at the top.  Do you have it in front of you?  02:28

12     A.   I do.                                    02:28

13     Q.   It would be your opinion that Brian     02:28

14 Glauser is preprogrammed?                         02:28

15     A.   Not that particular one.                02:28

16     Q.   What about where it says Mike Lambert?  02:28

17 Is that preprogrammed?                            02:28

18     A.   That one, I would assume not.           02:28

19     Q.   Okay.  What about Poker?  Is that       02:28

20 preprogrammed?                                    02:28

21     A.   I would assume not.                     02:28

22     Q.   What about Richard Locke?  Is that      02:28

23 preprogrammed?                                    02:28

24     A.   I would assume not.  As I mentioned,    02:28

25 those would all be variables.                     02:28

1    message?                                         02:36

2         A.    Well, Figure 8 is, basically just a   02:36

3    method to transmit.  I'm just saying that Figure 7    02:36

4    ends up calling that method to actually transmit the   02:36

5    message.                                         02:36

6         Q.    Okay.  I'll ask it a different way.   02:36

7              Do you know whether they cause        02:36

8    separate text messages to be sent or whether they are   02:36

9    part of the process of sending the same text message?   02:36

10        A.    I don't know for certain, no.         02:37

11        Q.    Is it your understanding that what you've   02:37

12   referred as to preprogrammed text messages can happen   02:37

13   without a user taking any action?                02:37

14        A.    Once you get to that part of the process,   02:37

15   yes.                                             02:37

16        Q.    Let me ask it a different way.        02:37

17              Can these -- what you've referred to   02:37

18   as preprogrammed text message be sent if no user   02:37

19   takes action?                                    02:37

20        A.    I'm not aware if they do or not.      02:37

21        Q.    So if somebody in this case has taken the   02:37

22   opinion that these messages cannot be sent unless a   02:37

23   user takes some action, do you have any basis to   02:37

24   dispute that?                                    02:37

25        MR. RICHMAN:  Objection.  Ambiguous.  It's   02:37

Page 244

| | | |
|---|---|---|
| 1 | not clear what you mean by action, but you can go | 02:38 |
| 2 | ahead and answer, Shawn. | 02:38 |
| 3 | THE WITNESS:  Can you say it again? | 02:38 |
| 4 | BY MR. HAWK: | 02:38 |
| 5 | Q.   Sure. | 02:38 |
| 6 | If somebody in this case has taken | 02:38 |
| 7 | the opinion that these messages that you've referred | 02:38 |
| 8 | to as preprogrammed text messages cannot be sent | 02:38 |
| 9 | unless a user takes some action, do you have any | 02:38 |
| 10 | basis to dispute that? | 02:38 |
| 11 | MR. RICHMAN:  Same objection. | 02:38 |
| 12 | You can answer. | 02:38 |
| 13 | BY THE WITNESS: | 02:38 |
| 14 | A.   No.  I don't think I could definitively | 02:38 |
| 15 | dispute that, no. | 02:38 |
| 16 | BY MR. HAWK: | 02:38 |
| 17 | Q.   What do you mean by definitively? | 02:38 |
| 18 | A.   Well, I mean, there's -- based on the | 02:38 |
| 19 | code that we have here, I wasn't provided with all | 02:38 |
| 20 | code.  There's still some other code that GroupMe | 02:38 |
| 21 | uses that I don't have in particular.  I couldn't say | 02:38 |
| 22 | for certain what that other code might do or might | 02:39 |
| 23 | not do. | 02:39 |
| 24 | Q.   Okay.  So is it fair to say that you | 02:39 |
| 25 | would not have any reason to dispute an opinion, if | 02:39 |

1   somebody gives it in this case, that these cannot be     02:39

2   sent without a user taking action?     02:39

3        MR. RICHMAN:  Same objection.     02:39

4   BY THE WITNESS:     02:39

5        A.   That's what I said.     02:39

6   BY MR. HAWK:     02:39

7        Q.   Okay.  Thank you.     02:39

8             So is it fair to say that your     02:39

9   Opinion No. 2 that these text messages -- strike     02:39

10  that.     02:39

11            Opinion No. 3, Page 9.  Do you see     02:39

12  the header at the top?     02:39

13       A.   I do.     02:39

14       Q.   "The assignment of ten-digit telephone     02:39

15  numbers to GroupMe is an automated process."     02:39

16       A.   I do see that.     02:39

17       Q.   Is that your Opinion No. 3?     02:39

18       A.   That is my opinion.     02:39

19       Q.   Has it changed since you signed this     02:39

20  declaration?     02:39

21       A.   It has not.     02:39

22       Q.   Has it changed since you were -- has it     02:39

23  changed since you were asked to form an opinion in     02:40

24  this case?     02:40

25       A.   It has not.     02:40

Page 246

```
 1           And then they assign that group          02:43
 2    telephone number to the group, again, meaning that   02:43
 3    that's the phone number that can be used to          02:43
 4    communicate back and forth.                          02:43
 5    BY MR. HAWK:                                          02:43
 6         Q.   Okay.  Is it your opinion that a number    02:43
 7    can be assigned without a user creating a group?     02:43
 8         A.   I know it would happen if a user created   02:44
 9    a group.  I'm not aware if it could happen without a 02:44
10    user creating a group or not.                        02:44
11         Q.   Okay.  Did you attempt to find what calls  02:44
12    this method, reserve group telephone number,         02:44
13    mentioned in Paragraph 16?                           02:44
14         A.   Again, I'm sure I did.  I don't remember   02:44
15    offhand now which one that would be.                 02:44
16         Q.   If someone has taken an opinion in this    02:44
17    case that a group number cannot be assigned unless a 02:44
18    user creates a group, have you seen anything in the  02:44
19    documentation that would refute that?                02:44
20         A.   Not that I can see, no.                    02:44
21         Q.   Okay.  So aside from these documents that  02:44
22    are listed in Opinion 3, you didn't rely on any other 02:45
23    documents in forming the opinion?                    02:45
24         A.   That's correct.                            02:45
25         Q.   Okay.  Did you rely on any of -- strike    02:45
```

Page 250

1   a Twilio account and it stores its log-in credentials    02:52

2   and logs in to transmit text messages?    02:52

3           A.    The server does, yes.    02:52

4           Q.    Do you have any idea what causes GroupMe    02:52

5   to log in to Twilio?    02:52

6           A.    Once a -- well, anytime that the API    02:52

7   would need to be called.  So when a text message    02:52

8   would need to be sent would be an example.    02:52

9           Q.    Okay.  And if somebody in this case has    02:52

10  given an opinion that GroupMe does not attempt to    02:53

11  route a text message as part of the group through    02:53

12  Twilio unless a user takes some action, have you seen    02:53

13  anything in the documents you reviewed that would    02:53

14  dispute that?    02:53

15          MR. RICHMAN:  Objection.  Again, it's    02:53

16  ambiguous as to who the user is and what action would    02:53

17  have to be taken, but go ahead, Shawn.    02:53

18  BY THE WITNESS:    02:53

19          A.    You're restricting this to the sending of    02:53

20  a text message?    02:53

21  BY MR. HAWK:    02:53

22          Q.    Let's start with the process.    02:53

23          A.    Can you explain to me again?    02:53

24          Q.    Sure.    02:53

25               If somebody in this case has given    02:53

```
1    the opinion or stated that GroupMe cannot route or      02:53

2    transmit a text message through Twilio, requiring       02:53

3    GroupMe to log in to Twilio unless a user first takes   02:53

4    some action, have you seen anything in the documents    02:53

5    you've reviewed that would dispute that?                02:53

6         MR. RICHMAN:  Same objection.                      02:53

7    BY THE WITNESS:

8         A.   Not necessarily, no.                          02:53

9    BY MR. HAWK:                                            02:54

10        Q.   Not at all or not necessarily?                02:54

11        A.   I would say not at all.                       02:54

12        Q.   Page 10, Paragraph 23, you say, "These        02:54

13   variables seemingly reference GroupMe's Twilio user     02:54

14   name."                                                  02:54

15             Do you see that?                              02:54

16        A.   I do.                                          02:54

17        Q.   Why do you use the word "seemingly"?          02:54

18        A.   Because I believe the variable names were     02:54

19   a little different.                                     02:54

20        Q.   The environmental variable names?             02:54

21        A.   That's correct.                               02:54

22        Q.   Is it environment variable or                 02:54

23   environmental variable?                                 02:54

24        A.   I've heard it both ways.  I think the         02:54

25   technical correct way is environment.                   02:54
```

Page 257

1      A.    Yes.  The deliver method, which uses,          03:04

2   basically, the gateway of Twilio.                       03:04

3      Q.    In Paragraph 25 and 26, do you see you         03:04

4   used the term "environment variable"?                   03:04

5      A.    Yes.                                            03:04

6      Q.    And you've said that that was incorrectly      03:04

7   used?                                                    03:04

8      A.    That's correct.                                03:04

9      Q.    Why did you use it then?                        03:04

10     A.    I had looked, and I think I saw the EM.         03:04

11  And I, you know, just made a quick typo and thought     03:04

12  it said ENV for a second.                               03:04

13     Q.    EMB?                                            03:04

14     A.    ENV for environmental variable.                03:04

15     Q.    And that doesn't change your conclusion,       03:04

16  that it says EM instead of ENV?                         03:04

17     A.    It does not.  Simple typo.                     03:04

18     Q.    Again, if somebody has stated in this          03:04

19  case that GroupMe cannot route text messages over its   03:05

20  service in conjunction with Twilio unless a user has    03:05

21  taken an action, have you seen anything in the          03:05

22  documentation that would refute that?                   03:05

23     MR. RICHMAN:  Same objection.  It's                  03:05

24  ambiguous, but go ahead.                                03:05

25

| | | |
|---|---|---|
| 1 | BY THE WITNESS: | 03:05 |
| 2 | A.   I have not. | 03:05 |
| 3 | BY MR. HAWK: | 03:05 |
| 4 | Q.   Opinion No. 6, please, on Page 13. | 03:05 |
| 5 | A.   Okay. | 03:05 |
| 6 | Q.   Sorry.  Really quick back to Paragraph | 03:05 |
| 7 | 27, at the bottom, last sentence on Line 25. | 03:05 |
| 8 | The last two entries are 1600 | 03:05 |
| 9 | characters? | 03:06 |
| 10 | A.   Okay. | 03:06 |
| 11 | Q.   Is that a typo? | 03:06 |
| 12 | A.   No. | 03:06 |
| 13 | Q.   Okay.  The body of the text can contain | 03:06 |
| 14 | 1600 characters, according to the documentation; | 03:06 |
| 15 | right? | 03:06 |
| 16 | A.   Up to, yes. | 03:06 |
| 17 | Q.   And above that, in Paragraph 26, at Line | 03:06 |
| 18 | 17, you say, "These parameters appear to represent." | 03:06 |
| 19 | Do you see that? | 03:06 |
| 20 | A.   I do. | 03:06 |
| 21 | Q.   Why do you use the word "appear"? | 03:06 |
| 22 | A.   Just because the wording was a little | 03:06 |
| 23 | different.  So... | 03:06 |
| 24 | Q.   The wording? | 03:06 |
| 25 | A.   For example, the "to" and the "from" are | 03:06 |

Page 267

1   GroupMe logs in to Twilio, using the stored          03:17

2   credentials?                                          03:17

3        A.   I would say so, yes.                        03:17

4        Q.   Have you reviewed, in forming your          03:17

5   opinions, GroupMe's motion for summary judgment?      03:17

6        A.   I have not.                                 03:17

7        Q.   Have you reviewed the declaration of        03:17

8   Steve Martocci, submitted along with GroupMe's        03:18

9   motions for summary judgment, in forming your         03:18

10  opinions?                                             03:18

11       A.   I have not.                                 03:18

12       Q.   In forming your opinions, have you          03:18

13  reviewed the declaration of John Pignata, submitted   03:18

14  along with GroupMe's motion for summary judgement?    03:18

15       A.   I have not.                                 03:18

16       Q.   In forming your opinions, have you          03:18

17  reviewed the declaration of Ameer Badri submitted     03:18

18  with GroupMe's motion for summary judgement?          03:18

19       A.   I have not.                                 03:18

20       Q.   Do you believe that GroupMe automatically   03:18

21  dials phone numbers -- strike that.                   03:18

22            Do you have any reason to believe           03:18

23  GroupMe automatically dials phone numbers?            03:18

24       A.   I believe that as part of the process I     03:18

25  talked about, yes, that telephone numbers are         03:18

                                            Page 276

1    automatically dialed.                              03:18

2        Q.   And that's the process focused on the    03:18

3    time period after a user takes action; correct?   03:18

4        A.   That's correct.                           03:18

5        Q.   And do you have any reason to believe     03:18

6    Twilio automatically dials phone numbers?          03:18

7        A.   I do.                                      03:19

8        Q.   And is that the same process you          03:19

9    described?                                         03:19

10       A.   Yeah.  Except they would have to receive  03:19

11   it from their customer, which in this case would be 03:19

12   GroupMe.                                           03:19

13       Q.   And that focuses on the process after the 03:19

14   user takes action; correct?                        03:19

15       MR. RICHMAN:  Objection again as to the        03:19

16   ambiguity of user action, but go ahead, Shawn.     03:19

17   BY THE WITNESS:                                    03:19

18       A.   That would be based off, yes, what we've  03:19

19   been talking about, once you got past the first part 03:19

20   of a user entering the number.                     03:19

21       MR. HAWK:  Let's go off the record -- strike   03:19

22   that.  Let's stay on the record real quick.        03:19

23   BY MR. HAWK:                                        03:19

24       Q.   Mr. Davis, there are a number of          03:19

25   documents as part of Exhibit 3 that I believe you  03:19

Page 277

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, Lynn A. McCauley, a Certified
Shorthand Reporter of the State of Illinois, CSR,
RPR, License No. 84-003268, do hereby certify:

That previous to the commencement of the
examination of the aforesaid witness, the witness was
duly sworn by me to testify the whole truth
concerning the matters herein;

That the foregoing deposition transcript
was reported stenographically by me, was thereafter
reduced to typewriting under my personal direction
and constitutes a true and accurate record of the
testimony given and the proceedings had at the
aforesaid deposition;

That the said deposition was taken before
me at the time and place specified;

That I am not a relative or employee or
attorney or counsel for any of the parties herein,
nor a relative or employee of such attorney or
counsel for any of the parties hereto, nor am I
interested directly or indirectly in the outcome of

Page 290

1    IN WITNESS WHEREOF, I do hereunto set my

2  hand at Chicago, Illinois, this 14th day of October

3  2014.

4

5  _____

6  LYNN A. MC CAULEY, CSR, RPR

7  License No. 84-003268

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

To assist you in making corrections to your deposition testimony, please follow the directions below. If additional pages are necessary, please furnish them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make, insert the corrections on the errata sheet beside the page and line numbers.

If you are in possession of the original transcript, do NOT make any changes directly on the transcript.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet, above the designated "Signature" line.

## ERRATA SHEET

| Page | Line | |
|------|------|---|
| 10 | 20 | Change: "program" to "programmer" |
| | | Reason: transcription error |
| 24 | 4 | Change: "have" to "hash" |
| | | Reason: transcription error |
| 30 | 25 | Change: "that" to "than" |
| | | Reason: transcription error |
| 65 | 18-19 | Change: remove "for a" |
| | | Reason: transcription error |

| Page | Line | |
|------|------|--|
| | | Change: "delivered" to "deliver" |
| 262 | 5 | Reason: transcription error |
| | | Change: "2104" to "2014" |
| 289 | 19 | Reason: date error |
| | | Change: "can happen" to "have data" |
| 208 | 16 | Reason: transcription error |
| | | Change: _____ |
| ___ | ___ | Reason: _____ |
| | | Change: _____ |
| ___ | ___ | Reason: _____ |
| | | Change: _____ |
| ___ | ___ | Reason: _____ |
| | | Change: _____ |
| ___ | ___ | Reason: _____ |
| | | Change: _____ |

X_____   Subject to the above changes, I certify that the transcript is true and correct.


_____   No changes have been made. I certify that the transcript is true and correct.


_Shawn Davis_                         10/17/2014
**Signature**                          **Date**